**FILED**

MAY 2 4 2007
MAY 24, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JH

| | |
|---|---|
| 36 CAPITAL GROUP, LLC, BLUE WATER RESTAURANT, LLC, PETER BRAWERMAN, FREDDIE COLE, AGOSTINA FIASCHE, HECTOR GODINEZ, JON IMERMAN, JAKE ISENBARGER, ROBERT KENDALL LAURA KENDALL, RYAN KOLE, KEITH KOLTON, STEVE LAKE, AUSTIN LEE, LOU LITRENTA, JOHN LYNCH, JOHN MANGAN, JOHN MAY, LEE MENN, BRIAN PFEIFFER, PAUL RAZUMNA, NEAL SALMEN, NICK SCALABRINO, NOEL SMITH, TIM SWINDLE, KELLY WILHELM and GEOFF ZAR, | ) ) ) ) ) ) ) ) ) \ |
| Plaintiffs, | **07CV2942 JUDGE KENDALL MAG. JUDGE ASHMAN** |
| vs. | ) ) ) |
| | **JURY DEMANDED** |
| ANTHONY A. DEMASI and TSUNAMI CAPITAL, LLC, | ) ) ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs bring this action through their attorneys Timothy J. Riordan, Timothy S. Buckley and Mathew C. Wasserman of Defrees & Fiske LLC.

This is a case based upon fraud and misrepresentations made by the Defendants which induced Plaintiffs to invest in Tsunami Enterprises LLC which owns and operates Crescendo nightclub and restaurant in Chicago, Illinois. Among their requests for relief, Plaintiffs seek removal of the Defendants from the operation and control of the business.

## THE PARTIES

1.     Plaintiffs, 36 Capital Group, LLC, Blue Water Restaurant, LLC, Peter Brawerman, Freddie Cole, Agostina Fiasche, Hector Godinez, Jon Imerman, Jake Isenbarger,

Robert Kendall, Laura Kendall, Ryan Kole, Keith Kolton, Steve Lake, Austin Lee, Lou Litrenta, John Lynch, John Mangan, John May, Lee Menn, Brian Pfeiffer, Paul Razumna, Neal Salmen, Nick Scalabrino, Noel Smith, Tim Swindle, Kelly Wilhelm and Geoff Zar are all residents of the State of Illinois, except Kelly Wilhelm who is a resident of Colorado.

2.      Defendant Tsunami Capital, LLC ("Tsunami Capital") is an Illinois limited liability company established in 2002. Its principal place of business is 455 North Cityfront Plaza Drive, #3110, Chicago, Illinois.

3.      Defendant, Anthony A. Demasi, ("Demasi") is the principal and managing member of Tsunami Capital, LLC. He currently resides in Chicago, Illinois and is a licensed attorney.

4.      Tsunami Entertainment, LLC, ("Tsunami Entertainment")is an Illinois limited liability company established in 2006 with its principal place of business at 455 North Cityfront Plaza Drive, #3110, Chicago, Illinois.

5.      Tsunami Capital, LLC is the managing member of Tsunami Entertainment, LLC.

## JURISDICTION AND VENUE

6.      This is an action for violations arising under the Securities Act of 1933, 15 U.S.C.A. Sec. 77l, the Illinois Securities Act, 815 ILCS 5/12, et seq., and other Illinois statutory and common laws.

7.      Subject matter jurisdiction against Defendant Tsunami Entertainment, LLC and Anthony Demasi is proper pursuant to 28 U.S.C. §§1331 and 1343.

8.      Supplemental jurisdiction over the state causes of action against Defendants, Tsunami Entertainment, LLC and Anthony Demasi, is proper pursuant to 28 U.S.C. §1367.

259572.1                                                                 - 2 -

9. Supplemental jurisdiction over the state causes of action against Defendants, Tsunami Entertainment, LLC and Anthony Demasi, is proper pursuant to 28 U.S.C. §1367(a), commonly referred to as "Pendent" party jurisdiction, because the causes of action arise from a common nucleus of operative facts and they are so related to the claims in this lawsuit that they form part of the same case or controversy under Article 3 of the United States Constitution.

10. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Plaintiffs' claims arise in this district.

## BACKGROUND

11. Tsunami Entertainment, LLC was formed in 2006.

12. The Operating Agreement of Tsunami Entertainment adopted by the Company effective April 15, 2006 is attached as Exhibit 1.

13. Tsunami Capital and its management group, namely Demasi, are designated as the managing member of Tsunami Entertainment in ¶2.1 of its Operating Agreement.

14. On or about April 15, 2006, Demasi and Tsunami Capital issued on behalf of Tsunami Entertainment a "Confidential Private Placement Memorandum" ("the PPM", attached as Exhibit 2 to the Complaint) providing for the sale of a minimum of One Million Fifty Thousand Dollars ($1,050,000) and a maximum of One Million Seven Hundred Thousand Dollars ($1,700,000) of "Class A" units of Tsunami Entertainment, LLC.

15. The PPM stated, in part, at page 22, under the heading, **USE OF PROCEEDS**:

> The Company shall use the proceeds of this offering for general corporate purposes, including without limitation, the purchase of an existing restaurant property. The company believes it will achieve success by purchasing an existing restaurant venue and developing the property into a new and exciting food, drink and gathering place targeted to a mix of young urban professionals who are looking for an entertainment establishment that compliments *(sic)* their lifestyle. The Company intends to purchase an

established restaurant near the busy intersection of Ontario and Franklin in Chicago.

The company believes proceeds from the Maximum Offering amount and cash flow generated from operations will be sufficient to fund the Operation. (P.23)

16.     On or about May 10, 2006, Demasi and Tsunami Capital issued, on behalf of Tsunami Entertainment, a "Memorandum" ("the May 10 Memorandum") as an Amendment to the PPM. The Memorandum, among other things, increased the amount of capital to be raised pursuant to the offering from One Million Seven Hundred Thousand Dollars ($1,700,000) to Two Million Two Hundred Thousand Dollars ($2,200,000).   (See copy of Memorandum attached as Exhibit 3).

17.     The May 10, 2006 Memorandum also projected the use of the Two Million Two Hundred Thousand Dollar ($2,200,000) capital to be raised pursuant to the offering as follows:

a.     Purchase Price = One Million Fifty Thousand Dollars ($1,050,000)

b.     Build Out/Renovation = Five Hundred Fifty Thousand Dollars ($550,000)

c.     Operating Capital = One Hundred Thousand Dollars ($100,000)

The May10 Memorandum only provides for the expenditure of the original $1,700,000 and does not account for the use of the additional $500,000 projected to be raised.

18.     In addition, although not mentioned at all in the PPM or the May 10 memorandum, and inconspicuously buried Section 2.1 in the Operating Agreement was the following extraordinary provision:

2.1 MANAGER.  Subject to the provisions set forth in this Agreement, the day-to-day business and affairs of the Company shall be managed by the Managing Member.   The Members hereby designate Tsunami Capital LLC ("Tsunami"), and its Management Group, as the Managing Member; provided, that upon a permitted transfer of Tsunami's Interest in accordance with the Articles as set forth herein, the Substitute Member acquiring Tsunami's Interest shall be designated as the Managing Member. Tsunami Capital LLC may not be

removed as the Managing Member. It and all subsequent Managers shall be solely responsible for the management of the Company's business. They shall possess all rights and powers generally conferred by law and all rights and powers that are necessary, advisable or consistent in connection therewith and with the provisions of this Agreement. (emphasis added)

19.    In reliance upon the representations contained in the PPM and the May 10th

Memorandum, Plaintiffs invested the amounts stated below following their names:

| NAME | INVESTMENT AMT |
|------|----------------|
| 36 Capital Group, LLC | $300,000.00 |
| Blue Water Restaurant, LLC | $50,000.00 |
| Brawerman, Pete | $100,000.00 |
| Carbanara, Frank | $170,000.00 |
| Cole, Freddie | $15,000.00 |
| Fiasche, Agostina | $75,000.00 |
| Godinez, Hector | $120,000.00 |
| Imerman, Jon | $50,000.00 |
| Isenbarger, Jake | $50,000.00 |
| Kendall, Robert and Laura | $100,000.00 |
| Kole, Ryan | $5,000.00 |
| Kolton, Keith | $100,000.00 |
| Lake, Steve | $30,000.00 |
| Lee, Austin | $5,000.00 |
| Litrenta, Lou | $50,000.00 |
| Lynch, John | $50,000.00 |
| Mangan, John | $50,000.00 |
| May, John | $50,000.00 |
| Menn, Lee | $5,000.00 |

| | |
|---|---|
| Pfeiffer, Brian | $300,000.00 |
| Razumna, Paul | $100,000.00 |
| Salmen, Neal | $100,000.00 |
| Scalabrino, Nick | $50,000.00 |
| Smith, Noel | $100,000.00 |
| Stone, Joel | $50,000.00 |
| Swindle, Tim | $50,000.00 |
| Wilhelm, Kelly | $850,000.00 |
| Zar, Geoff | $25,000.00 |
| **TOTAL** | $2,930,000 |

20. Although the PPM as amended by the May 10 Memorandum, stated that the amount to be raised was Two Million Two Hundred Thousand Dollars ($2,200,000), more than Three Million Five Hundred Thousand Dollars ($3,500,000) has been invested in Tsunami Entertainment, LLC pursuant to the offering.

21. On information and belief, Plaintiffs believe that the Defendants have also barrowed as much as $250,000 on behalf of Tsunami Entertainment.

22. Plaintiffs were never advised by Demasi or Tsunami Capital, prior to or after making their investments in Tsunami Entertainment, that more than Two Million Two Hundred Thousand Dollars ($2,200,000) was needed and would be raised pursuant to the offering or that more than Two Million Two Hundred Thousand Dollars ($2,200,000) had already been invested.

23. Despite repeated requests, Plaintiffs have never been provided with a financial statement from Tsunami Entertainment, LLC accounting for the disposition of the funds raised pursuant to the offering, particularly the amount raised in excess of the Two Million Two Hundred Thousand Dollars ($2,200,000) provided for in the May 10th Memorandum.

24.     On April 25, 2007, the United States Commodity Futures Trading Commission filed suit in the United States District Court for the Northern District of Illinois against Demasi and Tsunami Capital, *United States Commodity Futures Trading Commission v. Anthony A. Demasi and Tsunami Capital, LLC*, Case No. 7 CV 2256.  ("the CFTC Case")

25.     In the CFTC case which related to solicitations by Demasi and Tsunami Capital in Tsunami Capital and LLCs other than Tsunami Entertainment, the CFTC alleged, in part, the following (See Complaint attached as Exhibit 4):

> a.     Demasi and Tsunami Capital solicited and accepted at least Three Hundred Thousand Dollars ($300,000) from at least three individuals who invested [in Tsunami Lakeshore] in early 2005 for the purpose of trading financial futures. (See CFTC Complaint, ¶1)
>
> b.     Demasi convinced at least one prospective pool participant to invest by providing him with a false track record showing that Tsunami Lakeshore was profitable in all but two months during 2003-2004 and had its highest monthly return of 26.85% in April 2003.  In reality, Tsunami Lakeshore did not have an active account in April 2003, lost money every month that it traded in 2003, and did not trade at all in 2004. (See CFTC Complaint, ¶3)
>
> c.     Desmasi and Tsunami Capital also distributed false statements to at least two pool participants throughout 2005, showing that they were earning substantial profits when the trading accounts in names of Tsunami Capital and Tsunami Lakeshore were overall unprofitable. (See CFTC Complaint, ¶4)
>
> d.     By making deceptive and misleading statements to pool participants and prospective pool participants regarding profit potential and risk of loss, Defendants cheated, defrauded and deceived pool participants and prospective pool participants in violation of §§(b)(a)(2)(i) and (iii), and 40(l) of the Commodity Exchange Act, as amended, "Act" 7 U.S.C. §6b(a)(2)(i) and (iii), and 60(l)(200). (See CFTC Complaint ¶5)
>
> e.     The total of Two Hundred Ninety-One Thousand Four Hundred Twenty-Five Dollars ($291,425) was pooled and deposited into the one funded Tsunami Lakeshore account.  The account was opened in June 2003 and by December 2003 all the funds were lost trading.  The account closed in January 2005. (See CFTC Complaint ¶19)
>
> f.     A total of One Million Nine Hundred Thirty-Nine Thousand Dollars ($1,939,000) was deposited into the three funded Tsunami Capital accounts between October 2002 and September 2006. By September 2006, One Million

Three Hundred Eighteen Four Hundred Fifty-Nine Dollars ($1,318,459) had been withdrawn and Six Hundred Twenty Thousand Five Hundred Forty-Two Dollars ($620,542) had been lost trading. (See CFTC Complaint ¶20)

g.      The Tsunami Capital and Tsunami Lakeshore accounts collectively lost money in 22 of the 29 months they were active. (See CFTC Complaint ¶21)

h.      Demasi solicited Bret Simons ("Simons") to invest in Tsunami Lakeshore in December 2004. (See CFTC Complaint ¶22)

i.      At that time, Demasi told Simons that Tsunami Capital operated Tsunami Lakeshore, and that Tsunami Lakeshore was a commodity futures fund with Six Million Dollars ($6,000,000) invested, with a minimum investment of Fifty Thousand Dollars ($50,000). (See CFTC Complaint ¶23)

j.      Contrary to Demasi's representations, however, in December 2004, Tsunami Lakeshore had a deficit of Four Thousand Four Hundred Twenty-Five Dollars ($425,000) in its trading accounts and none of the Tsunami Capital accounts were open or active. (See CFTC Complaint ¶24)

k.      In January 2005, Demasi provided Simons with a document, "Confidential Private Placement Memorandum Tsunami Lakeshore Integrated Fund, LLC" stating that Tsunami Lakeshore's managing member and commodity pool operator is Tsunami Capital and that Demasi is the principal of Tsunami Capital. It also stated that the pool would use Man & Refco, Inc. for clearing its trades. (See CFTC Complaint ¶25)

l.      In an attempt to get Simons to invest, Demasi also gave Simons a Profit & Loss spreadsheet on Tsunami Capital letterhead. The spreadsheet falsely claimed that Tsunami Lakeshore's trading was profitable in all but two months in 2003 and 2004, with rates of return as high as 26.85% in April 2003 and 22.21% in May 2003. (See CFTC Complaint ¶26)

m.      Defendants had one other active trading account in 2003, but it was carried at Man in the name Tsunami Capital. It was opened in October 2002, lost money trading every month except for February 2003, and closed in June 2003 with a total lost of Two Hundred Twenty-Nine Thousand Eight Hundred Thirty-Four Dollars ($229,834). (See CFTC Complaint ¶27)

n.      The quarterly statements that Simons received from Demasi for calendar year 2005 and first quarter of 2006 all reflected that Simons investments were earning profits. However, the Tsunami Lakeshore trading account was closed in January 2005, and the Tsunami Capital trading accounts were, if even part of the pool, sustained losses or were less profitable then represented in 5 of the 6 quarterly statements Simons received. (See CFTC Complaint ¶31)

o.    Also around this time, Simons requested that Demasi return Two Hundred Thousand Dollars ($200,000) that Simons had invested in another Tsunami Capital and Demasi business venture, Sugartooth Entertainment, LLC ("Sugartooth"), for the purpose of opening a nightclub in Chicago. (See CFTC Complaint ¶37)

p.    Upon information and belief, this Two Hundred Thousand Dollar ($200,000) investment in Sugartooth was commingled with funds intended for investment in the Tsunami Lakeshore commodity pool.

q.    In August 2006, Simons hired an attorney who sent Tsunami Capital and Sugartooth demand letters requesting return of his principal and interest as reported on his last statement in June 2006 for Tsunami Lakeshore fund totaling Two Hundred Ninety-Four Thousand Five Hundred Fifteen Dollars ($294,515), and his Two Hundred Thousand Dollar ($200,000) in Sugartooth. (See CFTC Complaint ¶41)

r.    In response to the demand letters, in September 2006, Demasi sent Simons two checks for One Hundred Thousand Dollars ($100,000).    Both checks bounced. (See CFTC Complaint ¶42)

s.    Finally, Demasi repaid Simons the entire amount plus an additional One Thousand Four Hundred Eighty-Five Dollars ($1,485) in interest on the Sugartooth investment in various installments in late September, October and November 2006. (See CFTC Complaint ¶43)

t.    Budicak requested return of his balance in December 2006, and was told it would be returned in January 2007. On information and belief, to date, Budicak has not received his funds. (See CFTC Complaint ¶44)

u.    Demasi solicited prospective pool participants, and is the signatory on Tsunami Capital and Tsunami Lakeshore's account agreements with Man, and the Tsunami Lakeshore and Tsunami Capital bank accounts at New Century Bank. (See CFTC Complaint ¶48)

v.    Demasi knowingly induced Tsunami Capital's violations by personally participating in the fraud by knowingly misrepresenting profit potential, risk of loss, and trading profits to perspective and actual pool participants. (See CFTC Complaint ¶49)

w.    Demasi also knowingly distributed a false track record to at least one pool participant and false statements to at least two others, and failed to return pool participant's funds when requested, including issuing bad checks to at least one pool participant. (See CFTC Complaint ¶50)

24.    On April 26, 2007, the Court in the CFTC case entered an *Ex Parte* Statutory Restraining Order (See attached copy as Exhibit 5) providing, in part, for an "asset freeze" and

restraining and enjoining Demasi and Tsunami Capital from ". . . directly or indirectly withdrawing, transferring, removing, dissipating, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, converting, or otherwise disposing of any funds, assets or other property, wherever located, including funds, property or assets held outside the United States, except as ordered by the Court. The assets affected by this paragraph shall include both existing assets and assets acquired after the effective date of this Order, as well as, accounts not specifically identified below." (Exhibit 5, P. 3)

25.    On May 4, 2007, the Court in the CFTC case entered a Consent Order for preliminary injunction and other ancillary relief against Defendants, Anthony A. Demasi and Tsunami Capital, LLC (See copy attached as Exhibit 6) providing, in part, that Defendants are ". . . prohibited from directly or indirectly transferring, withdrawing, removing or disposing of any such funds, securities assets or other property of, or within the custody, control or possession of the Defendants, including, but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account, including funds or property of customers, wherever located, whether held in the name of Defendants or otherwise, and the assets affected by this paragraph shall include both existing assets and income and assets acquired after the effective date of this Order; except that the asset freeze on Lakeside Bank account in the name of Tsunami Express, LLC ending in 8900 shall be dissolved and Defendant Demasi shall immediately transfer the balance, Six Thousand One Hundred Thirty Dollars & 98/100 ($6,130.90) to Lakeside Bank account in the Tsunami Capital, LLC #2 ending in 1900 and these funds shall remain frozen. Defendant Demasi shall then be permitted to use the Lakeside Bank account ending in 8900 for cash receipts and receipts from credit card charges from the Reserve Nightclub acquired after the

effective date of this Order to meet payroll, operating, and related expenses for the Reserve Nightclub. Demasi will advise the Commission in writing, through its attorney, Susan Gradman, of Reserve Nightclub's receipts and expenses paid on a monthly basis beginning May 31, 2007 (Consent Order ¶4) (Emphasis Added)

26.     The May 4, 2007 Consent Order also required Demasi and Tsunami Capital to ". . . prepare and file with the Court, within twenty (20) days [by May 24, 2007] a complete and accurate accounting of their current assets. To Plaintiffs knowledge as of 3:00 p.m., May 24, 2007, Demasi and Tsunami Capital have not filed such an accounting with the Court.

27.     On May 17, 2007, the Court in the CFTC case entered a Consent Order modifying the May 4 Consent Order for preliminary injunction and other ancillary relief against Defendants, Anthony A. Demasi and Tsunami Capital, LLC providing, in part, that "The parties have met and conferred regarding the asset freeze contained in ¶4 of the Preliminary Injunction, and have agreed that it should be modified as follows:

> The asset freeze on Lakeshore Bank account in the name of Tsunami Entertainment, LLC ending in 4900 shall be dissolved and Defendant Demasi shall immediately transfer the balance, Forty-Six Thousand Four Hundred Forty-Five Dollars & 17/100 ($46,445.17), to Lakeside Bank account in the name of Tsunami Capital, LLC #2 ending in 1900, and these funds shall remain frozen. Demasi shall then be permitted to use the Lakeside Bank account ending in 4900 for cash receipts and receipts from credit card charges from the Crescendo Restaurant acquired after May 10, 2007 for the sole purpose of meeting payroll, operating, and related expenses for the Crescendo Restaurant. Demasi will advise the Commission in writing, through its attorney, Susan Gradman, of Crescendo Restaurant receipts and expenses paid on a monthly basis beginning on May 31, 2007, and will also provide the Commission, through its attorney, Susan Gradman, with receipts and expenses for the Reserve Nightclub for the months of February, March and April 2007 by May 31, 2007.

28.     Base on the allegations in the CFTC Complaint, it appears that as of May 17, 2007 only Forty-Six Thousand Four Hundred Forty-Five Dollars & 17/100 ($46,445.17) of over

Three Million Five Hundred Thousand Dollars ($3,500,000) invested in Tsunami Entertainment remained in the company account.

29.     Furthermore, because of the alleged wrongdoing of Demasi and Tsunami Capital and with their consent and approval, money in the Tsunami Entertainment bank account has been transferred and frozen in an account in the name of Tsunami Capital and the assets and income of the company has been subjected to the control of the CFTC and the Court.

30.     After Plaintiffs became aware of the over-subscription of the investment in Tsunami Entertainment, LLC by approximately Two Million Dollars ($2,000.000), Plaintiffs demanded that Demasi and Tsunami Capital withdraw as managing member of Tsunami Entertainment, LLC.

31.     Demasi, on behalf of himself and Tsunami Capital, refused to withdraw as managing member of Tsunami Entertainment, LLC.

32.     Tsunami Entertainment was scheduled to open the Crescendo nightclub/restaurant on May 18, 2007.

33.     In the face of the opening of the Crescendo nightclub/restaurant to be operated and controlled by Demasi and Tsunami Capital, the Plaintiffs again demanded that Demasi and Tsunami Capital withdraw from management and control of the Company or, in the alternative, permit oversight of the operation by a third-party designated by the Plaintiffs. (See copy of e-mail sent to the attorney representing Demasi and Tsunami Capital in the CFTC case, attached as Exhibit 6)

34.     On May 18, 2007, Demasi contacted Plaintiff's attorneys directly by telephone and gave the name of an attorney who Demasi claimed would represent him in the matter.

35.     On May 18, 2007, Plaintiffs' attorney contacted the attorney Demasi identified and reiterated Plaintiffs' demand that Demasi and Tsunami Capital withdraw from management and control of Tsunami Entertainment, Inc. or, in the alternative, permit oversight of the operation by a third-party designated by the Plaintiffs. Demasi's attorney stated that he would convey the demand to Demasi, but could not guarantee that he could respond that day.

36.     Demasi's attorney failed to call Plaintiffs' attorney as of May 22, 2007 and when he was contacted by telephone by Plaintiffs' attorney on May 22, 2007, the attorney stated that he was not going to represent Demasi in the matter and that Demasi was unwilling to discuss the matter further.

37.     The Crescendo nightclub/restaurant opened on May 18, 2007.

38.     The *pro forma* profit and loss statement attached to the PPM (See last page of Exhibit 3) projected weekly revenues of the Crescendo nightclub/restaurant at Seventy-Six Thousand Seven Hundred Fifty Thousand Dollars ($76,750).

39.     As of the present time, there is no effective control over the cash receipts of the Crescendo restaurant or over Defendant Demasi's and Tsunami Capital, LLC's handling of the cash receipts of the business as managing members of Tsunami Entertainment, LLC.

40.     Plaintiffs have justified concern regarding the security of the assets of Tsunami Entertainment, and in particular the cash receipts generated on a daily basis through the operation of the Crescendo nightclub/restaurant while under the management and control of Demasi and Tsunami.

41.     This concern has been heightened by recently obtained information that the employees and vendors of Crescendo, such the disc jockey, are not being paid on a regular basis,

that the reported cash receipts are substantially less than projected and to be reasonably expected from such an enterprise.

42.     In light of the false and misleading statements and omissions made by Demasi and Tsunami Capital, LLC as managing member of Tsunami Entertainment, LLC relating to the capitalization of the company, the actions of Demasi and Tsunami Capital, LLC which formed the basis for the CFTC Complaint and resulted in a freeze of the funds in the Tsunami Entertainment, LLC bank account, and the court supervision over the operations of Tsunami Entertainment, LLC's Crescendo nightclub/restaurant, Demasi and Tsunami Capital have violated the Federal Securities Act of 1933, the Illinois Securities Law of 1953, the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS, §505/1, *et seq.*, and the Illinois Uniform Deceptive Trade Practices Act 805 ILCS, §510/1.

43.     Defendants' actions, as stated above, also constitute fraud and conversion, and breach of their fiduciary duties as set out in the Illinois Limited Liability Company Act - 805 ILCS 180/1, *et seq.*, which provides, in part, that:

> 15-5(b) A member's duty of loyalty to a member-managed company and its other members include the following: (1) to account to the company and to hold as trustee for any property, profit or benefit derived by the member in a conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of a company's opportunity (§15-3(b)(1)) and "a member shall discharge his or her duties to a managed company and its members under this Act or under the Operating Agreement and exercise any rights consistent with the obligation of good faith and fair dealing (§15-3(d)).

The provisions relating to the duties of a member to a member-managed company are specifically made applicable to the manager of a manager-managed company pursuant to §15-5(g)(2) and (3).

## COUNT I

### VIOLATION OF THE SECURITIES
### ACT OF 1933
### 15 U.S.C.A. Sec. 77 et. seq.

1-43.  Plaintiffs repeat and reallege paragraphs 1 through 43, as paragraphs 1 through 43, of

this Count I.

44.  The Securities Act of 1933, 15 U.S.C.A Sec. 77l states as follows:

a.  In general, any person who:

i.  offers or sells a security in violation of section 77e of this title, or

ii.  offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall sustain the burden of proof that he did not know, and in the exercise of reasonable care copuld not have known, of such untruth or omission, shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, upon the tender of such security, or of damages if he no longer owns the security.

45.  Demasi and Tsunami Capital offered and sold securities, units in Tsunami

Entertainment LLC, to the Plaintiffs as stated above, by the use of instruments of transportation

or communication in interstate commerce or of the mails, by means of a prospectus or oral

communication, which included  untrue statements of material fact and which omitted material

facts necessary in order to make the statements, in light of the circumstances under which they

were made, not misleading, and the Plaintiffs did not know of the untruths and omissions.

## COUNT II

### VIOLATION OF THE ILLINOIS
### SECURITIES LAW OF 1953
### 815 ILCS 5/12, et.seq.

1-45.    Plaintiffs repeat and reallege paragraphs 1 through 45, as paragraphs 1 through 45, inclusive, of this Count II.

46.    The Illinois Securities Law of 1953 provides, in part, as follows:

"Sec. 12. Violation.  It shall be a violation of the provisions of this Act for any person:

F.    To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

G.    To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

H.    To sign or circulate any statement, prospectus, or other paper or document required by any provision of this Act or pertaining to any security knowing or having reasonable grounds to know any material representation therein contained to be false or untrue.

I.    To employ any devise, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

(1)    To employ any device, scheme or artifice to defraud any client or prospective client;

(2)    To engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; or

(3)    To engage in any act, practice, or course of business which is fraudulent, deceptive or manipulative. The Secretary of State shall for the purposes of this paragraph (3), by rules and regulations, define and prescribe means reasonably designed to prevent such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

47.    Demasi and Tsunami Capital violated the Illinois Securities Law of 1953 by engaging in transactions, practices and a course of business in connection with the sale and purchase of securities to the Plaintiffs, units of Tsunami Entertainment LLC, as set out above, which worked a fraud and deceit upon the Plaintiffs.

48.    Demasi and Tsunami Capital obtained money through the sale of securities, units of Tsunami Entertainment LLC, by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49.    Demasi and Tsunami Capital signed and circulated a statement, prospectus or other paper or document, namely, the Confidential Private Placement Memorandum (Exhibit 2) and the May 10 Memorandum (Exhibit 3) knowing or having reasonable grounds to know that material representations therein contained to be false or untrue.

## COUNT III

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS § 505/1, *et. seq.*)

1-49.   Plaintiffs repeat and reallege paragraphs 1 through 49, as paragraphs 1 through 49, inclusive, of this Count III

50.   This Count III is brought pursuant the Illinois Consumer Fraud and Deceptive Business Practices Act (hereinafter "the Consumer Fraud Act"), 815 ILCS § 505/1 *et. seq.*

51.   Section 2 of the Consumer Fraud Act, 815 ILCS § 505/2, states in pertinent part:

> Unfair...or deceptive acts or practices, including but not limited to, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact...in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

52.   The Defendants actions were unfair and deceptive acts in violation of the Consumer Fraud and Deceptive Business Practices Act.

53.   Defendants intended for Plaintiffs to rely upon the deceptive acts.

54.   Plaintiffs, by their reasonable reliance on the deceptive acts, have been misled, deceived and damaged.

## COUNT IV

### VIOLATION OF THE UNIFORM DECEPTIVE TRADE PRACTICES ACT

**(805 ILCS § 510/1, *et. seq.*)**

1-54.   Plaintiffs repeat and reallege paragraphs 1 through 54, as paragraphs 1 through 54, inclusive, of this Count IV.

55.   This Count IV is brought pursuant the Uniform Deceptive Trade Practices Act (hereinafter the "Deceptive Trade Practices Act"), 815 ILCS § 510/1 *et. seq.*

56.   Section 2(a) of the Deceptive Trade Practices Act, 815 ILCS § 510/2(a), states in pertinent part that:

> A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:
>
> > (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;
> >
> > (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;
> >
> > (8) disparages the goods, services, or business of another by false or misleading representation of fact;
> >
> > (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

57.   Defendants violated the Deceptive Trade Practices Act.

## COUNT V

### FRAUD

1-57.   Plaintiffs repeat and reallege paragraphs 1 through 57, herein, as paragraphs 1 through 57, inclusive, of this Count V.

58.   The Defendants induced Plaintiffs to invest in Tsunami Entertainment based on the misrepresentations and omissions set out above.

59.     Defendants intended to induce Plaintiffs to rely upon the misrepresentations and omissions.

60.     Plaintiffs reasonably relied upon the misrepresentations and omissions to their detriment.

61.     Plaintiffs have been damaged as a result of his reasonable reliance on the misrepresentations and omissions.

## COUNT VI

## CONVERSION

1-61.   Plaintiffs repeat and reallege paragraphs 1 through 115, as paragraphs 1 through 61, inclusive, of this Count V

62.     The Defendants have wrongfully maintained control, dominion and ownership over the assets of Plaintiff Tsunami Entertainment LLC.

63.     Plaintiffs have made several demands upon Defendants to relinquish control of Tsunami Entertainment LLC.  Defendant has rejected each of the demands.

64.     Plaintiffs have an immediate right to the recovery of the assets of Tsunami Entertainment LLC.

## COUNT VII

## BREACH OF FIDUCIARY DUTY

1-64.   Plaintiffs repeat and reallege paragraphs 1 through 64 as paragraphs 1 through 64, inclusive, of this Count VI.

65.     As the managing member of  Tsunami Entertainment LLC and as the principal managing member of Tsunami Capital LLC,  Tsunami Capital LLC and Demasi, respectively ,

have a fiduciary relationship to the Plaintiffs and thereby must fulfill the fiduciary duties of loyalty, honesty and fair-dealing, among others.

66.     Defendant have breached their fiduciary duties to Plaintiffs by knowingly and intentionally offering units for sale based on incorrect and incomplete information, allowing the assets of Tsunami Entertainment LLC to be frozen and restricted by the court order in the CFTC case, and by failing to properly manage the operations and cash flow of the Crescendo nightclub/restaurant.

67.     Plaintiff's injury was proximately caused by Defendants breaches of their fiduciary duties to Plaintiffs.

## RELIEF REQUESTED

68.     It is necessary that an injunction be issued against Defendants in order to prevent them from continued and future violation of their duties under the operating agreement and the Illinois Limited Liability Act and their fiduciary duties to the Plaintiffs.

69.     In the event that an injunction is not issued, Plaintiffs will suffer immediate irreparable harm, including harm to Plaintiffs' business.

70.     In the event that an injunction is issued, Defendants will suffer no harm.

71.     Plaintiffs have a strong likelihood of success on the merits.

72.     When balancing the equities, the equities favor Plaintiff as there is no legitimate purpose served by Defendants continuing to control and manage the business of Tsunami Entertainment LLC against the wishes and best interests of the Plaintiffs who represent     ???? percentage of the ownership of the company.

73.     Plaintiffs have no adequate remedy at law.

Based on the above allegations, the Plaintiffs request the Court to grant the following relief;

1.     Entry of a temporary restraining order restraining, enjoining and prohibiting, until further order of court, Defendants, Anthony A. Demasi and Tsunami Capital LLC and any person insofar as he or she is acting in the capacity of an officer, agent, servant, employee or attorney of the Defendants from, either directly or indirectly, exercising any control or management over Tsunami Entertainment LLC or its assets, including but not limited to the cash and credit card receipts received through the operation of the Crescendo nightclub/restaurant.

2.     Entry of a preliminary injunction order, pending the final outcome of the case, restraining, enjoining and prohibiting, or until further order of court, Defendants, Anthony A. Demasi and Tsunami Capital LLC and any person insofar as he or she is acting in the capacity of an officer, agent, servant, employee or attorney of the Defendants from, either directly or indirectly, exercising any control or management over Tsunami Entertainment LLC or its assets, including but not limited to the cash and credit card receipts received through the operation of the Crescendo nightclub/restaurant.

3.     Entry of a final order removing Defendants, Tsunami Capital LLC and Anthony A. Demasi from the position of managing-member of Tsunami Entertainment LLC.

4.     Entry of an order awarding money damages to Plaintiffs and against the Defendants, Tsunami Capital LLC and Anthony A. Demasi in an amount to be proven at trial, including reasonable attorney's fees and costs.

5.     Entry of an order providing such other and additional relief as the Court finds to be just and proper under the circumstances.

By: /s/ _____
One of their attorneys

Timothy J. Riordan (ARDC #2343231)
Timothy S. Buckley (ARDC #3128822)
Matthew C. Wasserman (ARDC #6287638)
**DEFREES & FISKE LLC**
200 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone: (312) 372-4000
Facsimile: (312) 939-5617

## VERIFICATION

I, John May, state that I have read the forgoing Complaint and that it is true and correct to my knowledge.

John May

Signed before me this
24th day of May, 2007

Notary

"OFFICIAL SEAL"
TIMOTHY J. RIORDAN
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 04/25/2008

259572.1

- 24 -

THE INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE, BUT HAVE BEEN ISSUED PURSUANT TO EXEMPTIONS UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES ACT EXEMPTIONS, AND THE REGISTERED HOLDERS OF SAID INTERESTS, BY EXECUTING THIS AGREEEMNT, WILL BE MAKING AN INVESTMENT REPRESENTATION WITH RESPECT THERETO. ACCORDINGLY, THE SALE, TRANSFER, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF ANY OF SAID INTERESTS IS RESTRICTED AND MAY NOT BE ACCOMPLISHED EXCEPT IN ACCORDANCE WITH SUCH INVESTMENT REPRESENTATION, THIS AGREEMENT AND AN APPLICABLE REGISTRATION STATEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER THAT REGISTRATION IS UNNECESSARY.

## OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
### A LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT (this "Agreement") is made effective by the undersigned as of this 15th day of April 2006.

### WITNESSETH

WHEREAS, the Members desire to join together in the enterprise to be carried on by the Company and to abide by the rules set forth herein.

NOW, Therefore, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree as follows:

### I. FORMATION

1.1 FORMATION. The undersigned have formed a limited liability company under the laws of the State of Illinois by filing effective as of March 16, 2006 articles of organization with the Illinois Secretary of State.

1.2 NAME. The name of this Company is Tsunami Entertainment LLC.

1.3 PURPOSE. The purpose for which this Company is formed is to engage in the acquisition, ownership and operation of entertainment venues and businesses, and the acquisition of real property associated therewith, and any other activity otherwise permitted under the Limited Liability

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006

1

EXHIBIT
1

Company Act of the State of Illinois (the "Act").

1.4 TERM. The term of the Company became effective on the date the articles of organization are filed with the Illinois Secretary of State, and shall continue perpetually, unless the Company is dissolved earlier pursuant to the provisions of this Agreement or as provided in the applicable provisions of the Act.

1.5 PRINCIPAL PLACE OF BUSINESS. The location of the principal place of business of the Company is Chicago, Illinois. The Manager may change the principal place of business and establish additional places of business as it deems necessary or desirable.

1.6 REGISTERED AGENT. The Company's agent for service of process shall be Anthony A. Demasi, 455 N. Cityfront Plaza Drive, Suite 1420, Chicago, Illinois 60611, or such other agent as the Manager may designate from time to time.

1.7 DEFINITIONS.    In addition to the terms defined in the text of this Agreement, the following definitions of terms apply to this Agreement:

a. "Book Value" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time as required or permitted under Treasury Regulations Section 1.704-1(b)(2)(iv)(d)-(g).

b. "Capital Account" means the account maintained for each Member in accordance with the provisions of the Code and the regulations promulgated thereunder, including but not limited to the rules regarding maintenance of capital accounts set forth in Treasury Regulation Section 1.704-1.

c. "Capital Contribution" means, with respect to any Member originally executing this Agreement, the capital contribution such Member actually makes pursuant to Section 3.1 of this Agreement; and with respect to any successor or assignee of any such Member's Interests, that amount of capital which is in the same proportion to the total capital contributed by such Member originally executing this Agreement with respect to such Member's Interests (Class A or Class B, as the case may be) as the Percentage Interest in the Company represented by the Interests received by such successor or assignee from such Member bears to the total Percentage Interest in the Company represented by such Member's applicable class of Units immediately prior to the event or transaction pursuant to which such successor or assignee received such interest.

d. "Company Losses" means items of Company loss and deduction determined in accordance with Section 5.1(b) of this Agreement.

e. "Company Minimum Gain" means an amount equal to the Company minimum gain, as determined in accordance with Treasury Regulations Section 1.704-2(d).

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
2

FROM: TJM BROKERAGE

05/14/2007 12:59     #749 P.064/083

f. "Company Profits" means items of Company income and gain determined in accordance with Section 5.1 of this Agreement.

g. "Deficit Capital Account" means, with respect to any Member, the deficit balance (if any) in such Member's Capital Account as of the end of the Fiscal Period or Fiscal Year, after giving effect to the following adjustments:

(i) credit to such Capital Account any amount which such Member is treated as being obligated to restore under Treasury Regulations Section 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the penultimate sentence of Treasury Regulations Section 1.704-2(g)(1) and (i)(5), after taking into account any changes during the period in Company Minimum Gain and in the Member Minimum Gain; and

(ii) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be construed in a manner consistent with those provisions.

h. "Distributable Cash" means, for each Fiscal Year or a portion thereof, all cash of the Company derived from any source after deducting (i) all cash expenditures incurred in connection with the operation of the Company's business, (ii) an amount necessary to pay all liabilities of the Company then due and owing including, without limitation, all loans to the Company and all advances made by any Member to the Company, and (iii) an amount determined by the Manager to be reasonably necessary or desirable as a reserve for the operation of the Company business, liabilities of the Company not yet due, and/or future or contingent liabilities of the Company.

i. "Member Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Company nonrecourse liability, as determined in accordance with Treasury Regulations Section 1.704-2.

j. "Member Nonrecourse Debt" shall have the same meaning as the term "partner nonrecourse debt" set forth in Treasury Regulations Section 1.704-2(b)(4).

k. "Member Nonrecourse Deductions" shall have the same meaning as the term "partner nonrecourse deductions" set forth in Treasury Regulations Section 1.704-2(i)(1) and (2).

l. "Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

m. "Nonrecourse Liability" shall have the meaning set forth in Treasury Regulations Section

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
3

1.704-2(b)(3).

1.8 FISCAL YEAR: The fiscal year of the Company (the "Fiscal Year") shall be each year ending December 31.

## II. MANAGEMENT

2.1 MANAGER. Subject to the provisions set forth in this Agreement, the day-to-day business and affairs of the Company shall be managed by the Managing Member. The Members hereby designate Tsunami Capital LLC ("Tsunami"), and its Management Group, as the Managing Member; provided, that upon a permitted transfer of Tsunami's Interest in accordance with the Articles as set forth herein, the Substitute Member acquiring Tsunami's Interest shall be designated as the Managing Member. Tsunami Capital LLC may not be removed as the Managing Member. It and all subsequent Managers shall be solely responsible for the management of the Company's business. They shall possess all rights and powers generally conferred by law and all rights and powers that are necessary, advisable or consistent in connection therewith and with the provisions of this Agreement.

2.2 TERM OF SERVICE. The Manager shall serve as such until resignation, death or a judicial adjudication of incompetency.

2.3 RIGHTS AND POWERS. Rights and powers of the Manager, by way of illustration but not by way of limitation, shall include the right and power to:

(A) Authorize or approve all actions with respect to distribution of funds and assets in kind of the Company; acquire, secure or dispose of investments, including, without limitation, selling and otherwise disposing of assets of the Company, borrowing funds, executing contracts, bonds, guarantees, notes, security agreements, mortgages and all other instruments to effect the purposes of this Agreement, whether with the guaranty by one or Members of the Company or otherwise; and execute any and all other instruments and perform any acts determined to be necessary or advisable to carry out the purposes of the Company.

(B) Subject to the limitations imposed by this Agreement, admit additional Members in substitution of Members disposing of their any interest or interests (hereinafter referred to collectively as "Interests" and each of them individually as an "Interest") in the Company.

(C) Perform any and all acts necessary to pay any and all organizational expenses incurred in the creation of the Company; and compromise, arbitrate or otherwise adjust claims in favor of or against the Company and to commence or defend against litigation with respect to the Company or any assets of the Company as deemed advisable, all or any of the above matters being at the expense of

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
4

the Company; and to execute, acknowledge and deliver any instruments to effect any of the foregoing.

(D) Purchase goods or services from any corporation or other form of business enterprise, except for any corporation or business enterprise owned or controlled by, or affiliated with, the Manager or Members, including management services at the usual and customary rates prevailing in the management industry from time to time for similar services.

(E) Establish Company offices at such other places as may be appropriate, hire Company employees and consultants, engage counsel and otherwise arrange for the facilities and personnel necessary to carry out the purposes and business of the Company, the cost thereof or incidental thereto to be paid by the Company.

(F) Enter into any contract to purchase, sell, mortgage, encumber, develop or operate any one or more real properties, or otherwise take any action reasonably related to the acquisition, sale, financing, development or operation of real properties or any amendment to the Articles of Organization of the Company otherwise permitted by the Act, without the consent of the Members of the Company, even in the absence of any authorization of such activities in the stated purpose of the Company, as contained in the Articles of the Organization of the Company.

2.4 RESPONSIBILITIES. The Manager shall manage or cause to be managed the affairs of the Company in a prudent and businesslike manner and shall devote such time to the Company affairs as they shall, in their good faith discretion, determine to be reasonably necessary for the conduct of such affairs; provided, however, that it is expressly understood and agreed that the Manager shall not be required to devote their entire time or attention to the business of the Company. In carrying out their obligations, the Manager shall:

(A) Obtain and maintain such public liability, hazard and other insurance as may be deemed necessary or appropriate by the Manager, but in any event in an amount sufficient to replace the building(s), together with improvements, and personal property comprising part of the Company's assets.

(B) Deposit all funds of the Company in one or more separate bank accounts, using such banks or trust companies as the Manager may designate (withdrawals from such bank accounts to be made upon such signature or signatures as the Manager may designate).

(C) Maintain complete and accurate books of account, and make such records and books of account available for inspection and audit by any Member or his duly authorized representative during regular business hours and at the principal office of the Company and prepare and distribute to all Members tax reporting information.

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
5

(D)   Cause to be filed such certificates and do such other acts as may be required by law to qualify and maintain the Company as a limited liability company under all applicable state laws.

(E)   Maintain a list, in alphabetical order, of all current Members and past Members, together with the mailing address of each Member.

(F)   Maintain copies of the Articles of Organization, any amendments thereto, and copies of present and past documents relating to the operation and business of the Company.

2.5 EXPENDITURES BY MANAGER.  The Company shall reimburse the Manager for any costs that may be properly expended by the Manager on behalf of the Company, including, without limitation, expenses incurred in relation to formation and organization of the Company and related transactions thereto.  The Company shall pay compensation for accounting, administrative, legal technical and management services rendered to the Company.  All of the aforesaid expenditures shall be made on behalf of the Company and each Member shall be entitled to reimbursement by the Company for any expenditure incurred by such Member on behalf of the Company which is made other than out of the funds of the Company.

2.6 AGREEMENTS AND POTENTIAL CONFLICTS.  The Manager shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the Company's business shall reasonably require.  In addition to the foregoing, the Company may retain the services of a law firm, accounting firm or other professional or nonprofessional firm or entity controlled by or affiliated with a Member (including the Manager) to render services or supply goods to the Company, and may pay reasonable compensation for such services or goods. Members of Tsunami Capital LLC may serve as employees or independent contractors of the Company and be compensated at then prevailing rates for such services.

2.7 LIABILITY TO THE COMPANY AND MEMBERS; INDEMNIFICATION. In carrying out their duties hereunder, the Manager shall not be liable to the Company nor to any Member for their good faith actions or failure to act, nor for any errors of judgment, nor for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement, but only for their own willful or fraudulent misconduct in the performance of their obligations under this Agreement, or for gross negligence or willful breach of their fiduciary duties under this Agreement. The receipt of advice of counsel that certain acts and omissions are within the scope of authority conferred by this Agreement shall be conclusive evidence of good faith; however, good faith may be determined without obtaining such legal advice.

The Company does hereby indemnify and hold harmless the Manager and their agents, officers and employees as to third parties against and from any personal loss, liability or damages suffered as a result of any act or omission which the Manager believed, in good faith, to be within the scope of

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
6

authority conferred by this Agreement, except for willful or fraudulent misconduct, gross negligence or willful breach of fiduciary duties, but not in excess of the capital contributions of all Members. Notwithstanding the foregoing, the Company's indemnification of the Manager and their agents, officers and employees as to a third party is only with respect to such loss, liability or damage which is not otherwise compensated for by insurance carried for the benefit of the Company. Insurance coverage for public liability, and all other insurance deemed necessary or appropriate by the Manager to the business of the Company, shall be carried in such amounts and of such types as shall be determined by the Manager, subject to Subparagraph 2.4(A).

**2.8 APPARENT AUTHORITY.** No financial institution or any other person, firm or corporation dealing with the Manager shall be required to ascertain whether the Manager are acting in accordance with this Agreement, but such financial institution or such other person, firm or corporation shall be protected in relying upon the deed, transfer or assurance of, and the execution of such instrument or instruments by, the Manager.

### III. MEMBERS

**3.1 MEMBERS; OTHER MATTERS BETWEEN MEMBERS.** The Class A Members and the Class B Members (the Class A and the Class B Members being hereinafter referred to collectively as the "Members" and each of them individually as a "Member"), respectively, of the Company are listed on Exhibit A, which is attached hereto and made a part hereof. Exhibit A reflects the initial capital contribution of each Member.   Upon payment of the initial capital contributed so provided, the Interests in the Company held by such Member shall be fully paid and nonassessable.   No Member shall be liable for the debts, obligations or other liabilities of the Company, except as required by applicable law.   No Class A Member shall have priority over any other Class A Member, and no Class B Member shall have priority over any other Class B Member, with respect to the return of any capital contribution, or distributions or allocations of income, gains, losses, deductions, credits, or other similar items.

**3.2 LIMITATION OF POWERS.** Except as otherwise specifically provided in this Agreement to the contrary, no Member shall have the right:

(A)  To take part in the control of the Company business or to sign for or to bind the Company, such power being vested in the Manager.

(B)  To have their capital contribution repaid except to the extent provided in this Agreement.

(C)  To require partition of the Company's property or to compel any sale or appraisal of the Company's assets.

(D) To sell or assign their Interest or Interests in the Company or to constitute the vendee or assignee thereunder, except as provided in this Agreement.

(E) To voluntarily withdraw as a Member from the Company.

**3.3 NO LIABILITY FOR DEBTS OF COMPANY, ETC.** No Member shall be personally held accountable for any of the debts, losses, claims, judgments or any of the liabilities of the Company beyond the Member's contributions to the capital of the Company, except as provided by applicable law.

## IV. MEETINGS OF MEMBERS

**4.1 ANNUAL MEETING.** The annual meeting of the Members of the Company, for the consideration of reports to be laid before such meeting and for the transaction of such other business as may properly be brought before such meeting, shall be held at the principal office of the Company in the City of Chicago, Illinois, in Cook County, State of Illinois, or at such other place, either within or without the State of Illinois, as may be designated by the Manager and specified in the notice of such meeting. Each such meeting shall be held on the last Tuesday of each April, if not a legal holiday, and, if a legal holiday, then on the next succeeding business day.

**4.2 SPECIAL MEETINGS.** Special meetings of the Members of the Company may be held on any day, when called by the Manager, or by the Members who hold at least thirty percent (30%) of the capital of the Company. Upon written request delivered either in person or by certified mail, return receipt requested, to the Manager by any Members entitled to call a meeting of Members, such Manager shall forthwith cause notice to be given to the Members entitled to such notice. The meeting must be held on a date not less than ten (10) nor more than sixty (60) days after the receipt of such request, as the Manager or Members may fix. If such notice is not given within twenty (20) days after the delivery or mailing of such request, the person or persons calling the meeting may fix the time of the meeting and give notice thereof in the manner provided for by law or this Agreement, or cause such notice to be given by any designated representative.

**4.3 NOTICE OF MEETINGS.** Not less than ten (10) nor more than sixty (60) days before the date fixed for a meeting, written notice stating the time and place of the meeting (and, in the case of a special meeting, the purposes of such meeting) shall be given. The notice shall be sent by personal delivery or by certified mail, return receipt requested, to each Member entitled to notice of the meeting who is a Member of record as of the day preceding the day on which notice is given, or, if a record date is duly fixed, as of that date. If mailed, the notice shall be addressed to the members at their respective addresses as they appear in the records of the Company.

**4.4 QUORUM; ADJOURNMENT.** Except as may otherwise be provided by law, at any meeting of the Members, the holders of a majority of the capital of the Company, either present in person or

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
8

by proxy, shall constitute a quorum for such meeting.

## V. PROFITS, LOSSES AND ACCOUNTING; DISTRIBUTIONS

### 5.1 ALLOCATION OF PROFITS AND LOSSES:

(A)    Allocations.    After the special allocations described in Section 5.1(B) of this Agreement have been given, Company Losses and Company Profits shall be allocated to and among the Members as follows:

(1)   Company Losses for a Fiscal Year or other Fiscal Period shall be allocated to and among the Members as follows:

(a) First, to the Class A Members, pro rata on the basis of the number of Units held by such Class A Members, to the extent of their aggregate positive balances in their Capital Accounts;

(b) Second, to the Class B Members to the extent of their positive balances in their Capital Accounts, in proportion to such balances;

(c) Third, except as otherwise provided in Section 5.1(A)(1)(d), to and among all Class A Members pro rata on the basis of the number of Units held by such Members; and

(d) If the allocation of any portion of the Company Losses for a Fiscal Year or other Fiscal Period pursuant to Section 5.1(A)(1)(a)-(c) above would cause any Members to have a Deficit Capital Account at the end of such Fiscal Year or other Fiscal Period, then all of such portion of such Company Losses shall instead be allocated among the other Members and such allocation shall be made pro rata on the basis of the number of Units held by such other Members to the maximum extent possible without causing any Member to have a Deficit Capital Account at the end of such Fiscal Year or other Fiscal Period; and

(2) Company Profits for a Fiscal Year or other Fiscal Period shall be allocated to and among the Members as follows:

(a) First, to the extent of the excess (if any) of the amount of Company Losses for the current Fiscal Year or other Fiscal Period and all prior Fiscal Years or other Fiscal Periods allocated pursuant to Section 5.1(A)(1)(d) over the amount of Company Profits allocated pursuant to this Section 5.1(A)(2)(a) for all prior Fiscal Years or other Fiscal Periods, such Company Profits shall be allocated to and among all Members in proportion and to the extent that such Members were allocated such excess amount of Company Losses;

(b)   Second, to the Members in an amount proportionate to the amount of Distributable Cash actually distributed to such Members for such Fiscal Year, up to the amount of such Distributable Cash so received;

(c)   Third, to the Class B Members to the extent necessary to cause their Capital Account to be equal to their then liquidation distribution computed under Section 5.4(B) below, as if all of the assets of the Company were then being sold and distributed in liquidation; and

(d)  the balance, if any, of such Company Profits shall be allocated to and among all Class A Members pro rata on the basis of the number of Units held by such Members.

(B)  Special Allocations.  The following special allocations will be made in the following order:

(1)   Company Minimum Gain Chargeback.   Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Article V, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.2(a) in intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(2)   Member Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Article V, if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt, attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Paragraph is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(3) <u>Qualified Income Offset</u>. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such Member's Deficit Capital Account.

(4) <u>Gross Income Allocation</u>.  In the event any Member has a Deficit Capital Account at the end of any Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such Deficit Capital Account as quickly as possible, provided that an allocation pursuant to this Section 5.2(d) shall be made only if and to the extent that such Member would have a Deficit Capital Account after all other allocations provided for in this Article V (other than Section 5.2(c) and 5.2(d)) have been made.

(5) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their Percentage Interests.

(6)  <u>Member Nonrecourse Deductions</u>. Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(7) <u>Section 754 Adjustments</u>.  To the extent that an adjustment to the tax basis of any Company property pursuant to Code Section 734(b) or 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or (m)(4) to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of its Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain or loss and shall be specially allocated to the Members in accordance with their interests in the Company in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies. Other items of gain or loss described in Section 4.2(b)(v) shall be allocated in a manner consistent with the manner in which the corresponding adjustments to Capital Accounts are made.

(8) <u>Allocations Relating to Taxable Issuance of Interests</u>. Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an Interest by the Company to a Member shall be allocated among the Members so that, to the extent possible, the net amount of such items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each Member if such items had not been realized.

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC<br>
A LIMITED LIABILITY COMPANY<br>
EFFECTIVE APRIL 15, 2006<br>
11

(9) Allocations Relating to Illinois Personal Property Tax Replacement Income Tax. If the Company incurs liability for Illinois Replacement Tax for a Fiscal Year with respect to which the Company also realizes Illinois Replacement Tax Savings, then items of Company loss or deduction attributable to the Company's Illinois Replacement Tax expense shall be allocated to the Members that are not themselves subject to the Illinois Replacement Tax for such Fiscal Year and such allocation shall be made in proportion to the amount of Company Profits allocated to such Members for the period with respect to which such Illinois Replacement Tax is imposed.

(10) Allocations Relating to Recapture Income. All recapture of income tax deductions resulting from the sale or disposition of Company shall be allocated to the Members to whom the deduction that gave rise to such recapture was allocated hereunder, or to such Member's successors, to the extent that such Members are allocated any gain from the sale or other disposition of such property.

(11) Curative Allocations. (a) The special allocations required under this Section 5.1(B) (other than this Section 5.1(B)(11) are intended to comply with the Treasury Regulations. It is the intent of the Company that all special allocations made pursuant to Section 5.1(B)(1) through Section 5.1(B)(10) shall be offset either with other special allocations made pursuant to Section 5.1(B)(1) through Section 5.1(B)(10) or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 5.1(B)(11). Therefore, the Manager may, in their sole discretion, make, pursuant to this Section 5.1(B)(11), such offsetting special allocations of Company income, gain, loss or deduction in any manner the Manager the Company's tax advisors determine to be appropriate, consistent with the goal that each Member's Capital Account balance be, to the extent possible, equal to the Capital Account balance such Member would have had in the absence of any allocations pursuant to Section 5.1(B)(1) through Section 5.1(B)(10).

(b) The Members expect and intend that upon the liquidation of the Company, after giving effect to all contributions and all allocations for all periods, each Member's Capital Account will have a positive balance equal to the amount of proceeds distributable to such Member. If in the opinion of the Manager and the Company's tax advisors this intended result would not be achieved without modification of the allocations required under this Article V, then the allocations required under this Article V shall be modified in a manner consistent with Treasury Regulations Section 1.704-1(b) and 1.704-2 to the extent necessary to cause each Member's Capital Account to have a balance equal to the amount of proceeds distributable to such Member upon the liquidation of the Company.

(c) If the Manager and the Company's tax advisors determine that the allocation of any item of Company income, gain, loss, deduction or credit is not specified in this Article V (an "unallocated item"), or that the allocation of any item of Company income, gain, loss, deduction or credit under this Article V is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-

1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii) (a "misallocated item"), then the Manager may allocate such unallocated item, or reallocate such misallocated item, to reflect the Members' economic interests in the Company.

(C) <u>Other Allocation Rules</u>. (1) Company Profits, Company Losses, and all other items of Company income, gain, loss, deduction and credit shall be determined by the Manager on a daily, monthly or other basis, using any method permitted under Code Section 706 and the Treasury Regulations.

(2) Company Profits and Company Losses allocable to Class A and Class B Members shall be allocated pro rata based upon each member(s) interest.

(3) The Members are aware of the tax consequences of the allocations required under this Article V and each Member hereby agrees to be bound by the provisions of this Article V in reporting such Member's share of Company income, gain, loss and deduction for federal income tax purposes.

(4) Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company (within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' interests in Company profits are in proportion to their Interests.

(5) As between a Member and any permitted (under this Agreement) transferee of all or any portion of such Member's Interest, Company Profits and Company Losses shall be allocated by the Manager in a manner intended to comply with Section 706 of the Code and the Treasury Regulations promulgated thereunder. In order to make such an allocation, the Manager may, in their discretion, close the Company's books on the date of such permitted transfer.

(D) <u>Allocations Solely For Tax Purposes</u>. (1) Allocations required under this Section 5.1(D) are solely for tax purposes and shall not affect any Member's Capital Account or any Member's share of any distribution from the Company.

(2) Allocations of tax credits, tax credit recapture, tax benefit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(3) Items of Company income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variance between the tax basis of such property to the Company and its Book Value.

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
13

   (4) If the Book Value of any Company property is adjusted pursuant this Agreement, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such Company property shall take account of any variation between the tax basis of such Company property and its Book Value in the same manner as required under Code Section 704(c).

### 5.2 ACCOUNTING:

   (A) The Company books shall be kept on the accrual basis and in accordance with reasonable accounting principles consistently applied.

   (B) The fiscal year of the Company shall end on December 31.

### 5.3 MEMBER'S CAPITAL ACCOUNTS:

   (A) A separate Capital Account will be maintained for each Member in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv) and 1.704-2, as amended. Each Member's Capital Account will be increased by: (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such property that the Company assumes or takes subject to for purposes of Code Section 752); and (3) allocations to such Member of Company Profits and other allocations to such Member of items of Company income or gain. Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such member is considered to assume to take subject to under Code Section 752); and (3) allocations to such Member of Company Losses and other allocations to such Member of items of Company loss or deduction. The Company may, upon the occurrence of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property.

   (B) For purposes of computing the amount of any item of Company income, gain, loss or deduction to be reflected in the Member's Capital Accounts and to be allocated pursuant to Article V of this Agreement, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose), provided that:

   (i) The computation of all items of income, gain, loss and deduction shall include income and expense of the Company that is exempt from federal income tax and also those items described in Code Section 705(a)(1)(B) or Treasury Regulations Section 1-704-1(b)(2)(iv)(i), without regard to the fact that such items are not includible in gross income or deductible for federal income tax purposes;

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
14

(ii) If the Book Value of any Company property is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from a disposition of such property;

(iii) Items of income, gain, loss or deduction attributable to the disposition of Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property;

(iv) Items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(v) To the extent an adjustment pursuant to Code Section 732(d), 734(b) or 743(b) to the adjusted tax basis of any Company property is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the tax basis) or loss (if the adjustment decreases the tax basis); and

(vi) Items of Company income, gain, loss or deduction which are specially allocated pursuant to Section 5.1 shall be determined in the same manner as Company Profits and Company Losses, but such specially allocated items shall not be taken into account in computing Company Profits and Company Losses.

(C) The rules set forth in this Section 5.3 are intended to comply with the requirements of the Code and Treasury Regulations. If, in the opinion of the Manager and the Company's tax advisors, the rules set forth in this Section 5.3 must be modified in order for the Company to comply with the requirements of the Code or the Treasury Regulations, then the method in which Capital Accounts are maintained shall be so modified.

5.4    DISTRIBUTIONS:

(A) Timing and Amount. Within thirty (30) days after the end of each Fiscal Year, the Manager shall determine the amount of Distributable Cash, if any. The "cash flow" of the Company for any Fiscal Year shall consist of all cash received by the Company during that Fiscal Year from any source (other than proceeds from the sale of Interests in the Company), including the sale, exchange or other disposition of all or substantially all of the non-cash assets of the Company (a "Capital Transaction"); less cash expended for the debts and expenses of the Company, principle payments on any indebtedness of the Company, capital expenditures and reasonable reserves otherwise required for the Company business as determined by the Manager in its sole and absolute

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
15

discretion. The Manager may, but are not required to, make distributions more frequently based on estimates of Distributable Cash then available.

(1) If available, cash flow shall be distributed among the members as follows:

(a) First, TO BE PAID QUARTERLY. Class B member(s) shall receive the first twenty (20%) percent of net profits. Thereafter, Class A member(s) shall receive the remaining eighty (80%) percent of net profits until such member(s) has received an aggregate amount equal to one hundred (100%) percent of its initial capital contribution.

(b) Thereafter, TO BE PAID BI-ANNUALLY. Class B member(s) shall receive the first twenty (20%) percent of net profits. Thereafter, the remaining Eighty (80%) of net profits shall be split Fifty (50%) percent to Class A member(s) and Thirty (30%) percent to Class B member(s).

(c) In the event management can establish an agreement with Adam Goldstein (AKA DJ AM) (the "Artist") to provide residency DJ services, Class B member(s) and Class A member(s) mutually agree to offer Artist a to be determined equity interest. This Interest shall be split equally between Class B member(s) and Class A member(s). *This provision shall be negotiated and is subject to unanimous approval from all Members.*

(d) In the event management can establish an agreement with Phil Stefani to provide services for the Company, Class B member(s) and Class A member(s) mutually agree to offer Mr. Stefani a to be determined equity interest. This interest shall be split equally between Class B member(s) and Class A member(s). *This provision shall be negotiated and is subject to unanimous approval from all Members.*

(2) Notwithstanding paragraph (1) above, if the Company has creditors, no distribution may be made if, after giving effect to such distribution, either (i) the Company would be insolvent, as defined in Section 1-5 of the Act, or (ii) the net assets of the Company would be less than zero.

(3) In the event that any Member is allocated profits in a year without distributions of

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
16

cash attributable to such year sufficient to pay the taxes thereon, the Manager may, in its sole discretion, distribute cash in priorities other than those provided by Sections 5.4(A)(1) or (2) hereof in order to assist such Member(s) in paying income taxes. All amounts so distributed shall be considered as advances of amounts to be distributed in the future and shall reduce the amount of future distributions to the recipient; provided, however, the recipient shall not be obligated to refund the amount of such advance if there are not sufficient cash distributions in the future.

**(B)** _Distributions Upon Liquidation or Sale_. Upon a liquidation of the Company, or a sale of all or substantially all of the properties and assets of the Company, the Distributable Cash attributed to such sale shall be distributed to the Members pro rata, increased by any other capital contributions made by the respective Members.

**(C)** _Limitations on Distributions_. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to any Member if such distribution would violate the Act or other comparable applicable law or if such distribution is prohibited in any loan agreement(s) for borrowed money between the Company and its lender(s).

**(D)** _Distributions in Respect of Illinois Replacement Tax Savings_. An amount equal to the Company's Illinois Replacement Tax Savings for any Fiscal Year shall be distributed to the Members that are themselves subject to the Illinois Replacement Tax for such Fiscal Year, and such distribution shall be made to and among such Members in proportion to the amount of Company Profits allocated to such Members for such Fiscal Year.

## VI. TRANSFER OF MEMBER'S INTEREST; DISPUTES; DISSOCIATION

**6.1 TRANSFER OF INTERESTS SUBJECT TO THIS AGREEMENT.** Should a Member desire to sell, assign or exchange all or any part of their Interests to any person seeking to become a substituted Member, such Member (hereinafter "assignor") who desires to assign all or any part of their Interest in the Company shall not have the right to transfer to another the whole or any part of such Interest, except as set forth in this Agreement.

**6.2 TRANSFERS TO CONTROLLED ENTITIES.** Notwithstanding any provision contained herein to the contrary, any Member may assign any portion or all of their Interests in the Company to an entity controlled solely by such Member (a "Permitted Assignee") without the consent of the other Members (a "Permitted Assignment"), and the Permitted Assignee shall become a Class A Member or Class B Member of the Company, as the case may be, without further approval of the other Members; _provided, however_, that any transfer by any Member of any shares, interests or beneficial interests in, or surrender any control of, a Permitted Assignee (a "Permitted Assignee Transfer") following a Permitted Assignment without first offering all of the Interests in the Company held by the Permitted Assignee pursuant to the terms and conditions of this Subparagraph

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
17

6.2, except that a Sale at one-half (1/2) the Fixed Price, as such terms are hereinafter defined, shall be deemed to have been made to the Permitted Assignee, and such Permitted Assignee Transfer shall be deemed to give the other Initial Member the right to respond to such Sale as if a Selling Notice, as such term is hereinafter defined, shall have been made at the time the other Members shall have been made aware of the Permitted Assignee Transfer.

6.3    OTHER SALES, TRANSFERS AND ASSIGNMENTS.  Except as otherwise provided herein, no Member may make any inter vivos sale, assignment or transfer of their Interest or Interests or any part thereof other than by a bona fide sale.  In the event of a contemplated or attempted inter vivos sale, assignment or transfer (hereinafter referred to collectively as a "Sale"), by a Member (hereinafter called the "Selling Member"), of all or any part of its Interests to an individual or other entity which is not then a Member, each of the other Members (hereinafter called the "Non-Selling Members"), shall have the prior right to purchase such Interest or Interests in the following manner:

(a)    The Selling Member shall, not less than thirty (30) days prior to the anticipated date of transfer of its Interest or Interests, give written notice (hereinafter sometimes called the "Selling Notice"), thereof by certified or registered mail, to the Company at its principal place of business and to all the other Members at their respective places of business, of the price and all the terms and conditions of the proposed Sale, including, but not limited to, the name and address of the proposed purchaser(s).    The Selling Notice shall be considered a grant of an option to the Non-Selling Members to purchase the Selling Member's Interest or Interests during said thirty (30) day period.

(b)    Each of the Non-Selling Members may, within said thirty (30) day period, give written notice, sent by registered or certified mail, to the Selling Member with a copy to the Company, of its desire to exercise its option to purchase all or a part of the Selling Member's Interest or Interests, upon the terms and conditions and at the price specified in the Selling Notice. If any Non-Selling Members desire to purchase all or part of said Interests, and if the aggregate of the portions of the Interests sought to be purchased by the Non-Selling Members exceeds all or One Hundred Percent (100%) of said Interests, then the Non-Selling Members desiring to purchase said Interests shall do so in proportion to their respective Interests to the total Members' Interests seeking to purchase the Interests of the Selling Member.

(c)    If, upon the expiration of said thirty (30) day period, less than all of the Selling Member's Interests so offered, is subscribed to by one or more of the Non-Selling Members, then the Selling Member shall, in writing, notify those Non-Selling Members who have elected to purchase their proportionate shares of the Selling Member's Interests of the failure of the Non-Selling to elect to purchase all of the Interests so offered.  Thereupon, the Non-Selling Members who have elected to buy a portion of the Selling Member's Interests so offered for sale shall have an option for fifteen (15) additional days, from the date of their respective receipt of such last notice from the Selling Member, in which to elect to purchase in the proportion set out hereinabove, all of

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
18

FROM:TJM BROKERAGE
3124924499
14/2007 13:04
#749 P.080/083

the remaining unsold portion of the Selling Member's Interests so offered.

(d)    At the termination of the aforesaid thirty (30) day or forty-five (45) day period, as the case may be, the Selling Member shall be free to dispose of such portion or all of its Interests with respect to which the other Members have not exercised their respective options, but only in the manner, to the person or persons at the price and on the terms stated by him or her in the Selling Notice and only for a period of twenty (20) days following the date of expiration of said thirty (30) or forty-five (45) day period, as the case may be.  In the event that the Selling Member fails thus to dispose of its said Interests or part thereof during such twenty (20) day period, the provisions of subparagraphs (a) and (b) of this Paragraph 6.3 shall again be applicable to any further contemplated disposition by the Selling Member of its Interests or any part thereof.

6.4 LIABILITIES SURVIVE ASSIGNMENT.  No assignment of any Member's Interest in compliance with this Article VI, even if it results in the substitution of the assignee as a Member herein, shall release the assignor from those liabilities to the Company which survive such assignment.

6.5 MECHANICS OF ASSIGNMENT.  Any assignment by a Member of all or any part of their Interest in the Company shall be subject to the following:

(A)    The assignment instrument shall be in form and substance satisfactory to the Manager.

(B) The assignee shall have submitted their written acceptance and adoption of all the terms and provisions of this Agreement, including any and all subsequent amendments to this Agreement.

(C) The assignor shall have paid, or obligated himself to pay, as the Company may determine, all reasonable expenses connected with such transfer.

6.6 SECURITIES LAW MATTERS. No Member's Interest in the Company has been registered under the Securities Act of 1933, as amended (the "Act"). Notwithstanding any other provisions in this Agreement, no Member's Interest may be offered for sale, sold, transferred or otherwise disposed of unless at the expense of the transferring Member, the Company receives an opinion of counsel letter, satisfactory to the Company, to the effect that such transfer is exempt from registration under the Act and is in compliance with all applicable federal and state securities laws and regulations.

6.7 DEATH OF A MEMBER OR CERTAIN OTHER INDIVIDUALS. Upon the death of a Member, the personal representative of said Member shall sell all of said Member's interests in the Company to the Company for the Fixed Price, as such term is hereinafter defined, within thirty (30) days of the death of said Member by tendering the Fixed Price (the "Repurchase Payment") to the

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
19

estate of such deceased Member. Upon the tender of the Repurchase Payment by the Company to the personal representative, said deceased Member's interests shall be transferred to the Company on the books of the Company, effective as of the date of death of the deceased Member. In the event that the Company notifies the personal representative within such thirty (30) day period that the Company is legally unable to purchase said deceased Member's interests, or that the other Members are willing to purchase said deceased Member's interests under this Subparagraph 6.7, the other Members shall tender the Fixed Price to the estate of the deceased Member, and thereby purchase the deceased Member's interests, as soon as commercially possible, and said deceased Member's interests shall be transferred to the other Members on the books of the Company, effective as of the date of the death of the deceased Member. The parties further agree that no term set forth in this Subparagraph 6.7 shall be construed to require any action by the personal representative from paying estate tax liabilities on an installment basis pursuant to Section 6116 of the Internal Revenue Code of 1986, as amended (the "Code"), and that any sale under this Subparagraph 6.7 may be structured, at the election of the personal representative, as a series of redemptions in order to comply with Sections 303 and 6116 of the Code, subject to documentation satisfactory to counsel to the Company, as long as such series of redemptions do not conflict with the Act or any other applicable law.

6.8 FIXED PRICE. The purchase price for a Member's Interests to be purchased in accordance with Subparagraph 6.7 shall be valued based upon the Manager' most recent valuation of the Company, which the Manager shall perform within One Hundred and Twenty (120) days after the end of each Fiscal Year, with such valuation of each Member's Interests being consistent with the distribution provisions of Subsection 5.4 herein, as if distributions were being made to the Members upon the sale or liquidation of the Company (the "Fixed Price"). In the event that a deceased Member's personal representative believes that the Fixed Price is inequitable, to the detriment of the estate of the deceased Member, said personal representative may sell said deceased Member's Interests for a Fixed Price based upon the Adjusted Value of the Company, as such term is hereinafter defined. For the purposes of this Subparagraph 6.8, the "Adjusted Value" of the Company shall be equal to the sum of (a) Eighty Percent (80%) of the Appraised Value of the Company, as such term is hereinafter defined. The "Appraised Value" of the Company shall be established by an valuation performed by a Valuation Specialist, as such term is hereinafter defined, whose fees shall be paid by the personal representative requesting the valuation. A "Valuation Specialist" is (a) a NACVA-certified valuation specialist selected mutually by the purchaser(s) and the seller of the Interests being valued, or, (b) in the event that said parties are unable to agree upon the identity of such a valuation specialist, a NACVA-certified valuation specialist selected by two NACVA-certified valuation specialists, one of whom has been selected by each such party.

6.9 DISSOCIATION: Notwithstanding any other provision of this Agreement to the contrary, no Member shall have any right of dissociation from the Company except upon the occurrence (a) of an event specifically described in Section 35-45 of the Act, or (b) under any other

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
20

applicable statutory provision granting members in an Illinois limited liability company the right to dissociate. This Section 6.10 shall not limit the rights of Members to make transfers of Interests otherwise permitted under this Article VI, any of such transfers being deemed not to constitute a dissociation, although, in some circumstances, thereby requiring a dissociation of the transferring Member. In the event of any dissociation of any Member, the Company shall have the right to purchase said Member's Interests in the Company, as though said Member had died, pursuant to the terms of Sections 6.7 and 6.8 of this Agreement.

## VII. DISSOLUTION AND TERMINATION

**7.1 DISSOLUTION.** Upon the occurrence of the following events, the Company shall be dissolved:

(A) the term of the Company expires;

(B) the Manager sell or transfer substantially all of the assets of the Company;

(C) the Company ceases its business operations;

(D) the occurrence of any event which shall make it unlawful for the Company to exist or requiring the termination thereof; or

(D) Members holding Interests representing not less than two-thirds (2/3) of the then-contributed capital of the Company vote to dissolve and terminate the Company.

**7.2 RIGHTS OF PERSONAL REPRESENTATIVE.** Upon the death or incompetency of a Member, and subject to the provisions of Subparagraph 6.7 herein, the Member's personal representative, executor or administrator shall have all of the rights of a Member for the purpose of managing or settling their estate and to designate an assignee of their Interest in the Company and to join with such assignee in following the procedures contained in this Agreement so that the assignee may become a Member.

**7.3 WIND-UP OF BUSINESS.** In the event of the dissolution of the Company, the business and affairs of the Company shall continue to be governed by this Agreement during the winding up of the Company's business and affairs.

## VIII. LIQUIDATION

**8.1 LIQUIDATION.** Upon the dissolution and/or termination of the Company, the Manager shall proceed with the liquidation of the Company and sale of its assets. The proceeds of such liquidation

OPERATING AGREEMENT OF TSUNAMI ENTERTAINMENT LLC
A LIMITED LIABILITY COMPANY
EFFECTIVE APRIL 15, 2006
21

**P & L Statement:**
**Ordinary Income/Expense**

**Income**

| | |
|---|---|
| Food sales | 429,000.00 |
| Bar Sales + Door | 3,991,000.00 |
| **Total Income** | **4,420,000.00** |
| Cost of Goods Sold (Liquor) | 797,940.00 |
| Cost of Goods Sold (Food) | 171,600.00 |
| **Gross Profit** | **3,450,460.00** |

**Expense**

**ENTERTAINMENT**

| | |
|---|---|
| DJ Fees | 52,000.00 |
| Misc. Ent. | |
| (Models, CD's, Guest DJ's etc.) | 48,000.00 |
| **Total ENTERTAINMENT** | **100,000.00** |

**GENERAL & ADMIN**

| | |
|---|---|
| Workers Comp Ins. | 12,000.00 |
| Liability/DRAM Ins. | 80,000.00 |
| Health Insurance | 3,200.00 |
| Insurance - Other | 1,000.00 |
| Licenses and Permits | 2,500.00 |
| Credit Card Fees | 100,000.00 |
| Bar Supplies | 60,000.00 |
| Miscellaneous | 36,000.00 |
| Legal Fees | 15,000.00 |
| Accounting Fees | 15,000.00 |
| Uniforms | 6,000.00 |
| Travel & Ent | 25,000.00 |
| **Total GENERAL & ADMIN** | **355,700.00** |

**LEASED EQUIPMENT**

| | |
|---|---|
| Empire | 8,000.00 |
| Dishwasher | 9,600.00 |
| POS | 12,000.00 |
| **Total LEASED EQPT** | **29,600.00** |

**MARKETING & ADVERTISING**

| | |
|---|---|
| Graphic Design | 40,000.00 |
| Media | 18,000.00 |
| Promotional Fees | 104,000.00 |
| Web Hosting | 250.00 |
| Marketing office | 29,000.00 |
| Public Relations | 25,000.00 |
| **Total MARKETING & ADVERTISING** | **216,250.00** |

**OFFICE EXPENSES**

| | |
|---|---|
| Cleaning Service | 31,200.00 |
| Office Supplies | 6,000.00 |
| Rent | 186,000.00 |
| Telephone+Cell | 12,000.00 |
| Utilities | |
| Gas and Electric | 20,000.00 |
| Waste Management | 12,000.00 |
| **Total OFFICE EXPENSES** | **267,200.00** |

**LABOR EXPENSE**

| | |
|---|---|
| Hourly Associates | 804,000.00 |
| (Including Overtime) | |
| Management | 210,000.00 |
| **Total LABOR EXPENSE** | **1,014,000.00** |
| **Net Ordinary Income** | **1,467,710.00** |

**Other Income/Expense**

Other Income

| | |
|---|---|
| Special Events | 120,000.00 |
| **Net Other Income** | **120,000.00** |
| **Net Income** | **1,587,710.00** |

**Assumptions**

**Bar Sales**

| Evening | # of Customer | Guest Check | Door | Weekly Revenue | Annual Revenue |
|---|---|---|---|---|---|
| Sunday | 100 | 20 | 0 | 2,000 | 104,000 |
| Tuesday | 100 | 20 | 0 | 2,000 | 104,000 |
| Wednesday | 375 | 20 | 0 | 7,500 | 390,000 |
| Thursday | 400 | 30 | 1000 | 13,000 | 676,000 |
| Friday | 625 | 32 | 2000 | 22,000 | 1,144,000 |
| Saturday | 750 | 35 | 4000 | 30,250 | 1,573,000 |
| **Total** | **2350** | | **7000** | **76,750** | **3,991,000** |

**Other Income**

**Private Parties**

Average of 4 per month
$1000 for rental
$40 per person for drinks

Average of 100 people = $20,000
Average Margin = 50%
**Monthly Other Income = $10000**

Cost of Goods Sold (Liquor) = 22% of Liquor Sales
(very conservative - we generally operate at 18%)

DJ Fees = 260 nights @ average of $200 per night
Promotional Fees = $2000/week * 52 weeks
Cleaning Service = $600/week * 52 weeks

OFFEREE: _____     MEMORANDUM NUMBER: _____

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## TSUNAMI ENTERTAINMENT LLC

455 N Cityfront Plaza Drive #1420
Chicago, Illinois 60611
Telephone: (312) 836-0001
Facsimile: (312) 836-1118

An Illinois Limited Liability Company

## OFFERING OF "CLASS A " UNITS OF TSUNAMI ENTERTAINMENT LLC

$100,000 per Unit

MAXIMUM OFFERING: $1,700,000 in the aggregate (17 UNITS)
MINIMUM OFFERING: $1,050,000 in the aggregate (10.5 UNITS)
MINIMUM INVESTMENT PER SUBSCRIBER: $100,000

The offering price per unit has been arbitrarily determined by the Company.

See Risk Factors: Arbitrary Determination of Offering Price

Date of Offering: April 15, 2006

The information contained herein is confidential and intended only for the person to whom it is transmitted.

EXHIBIT
2

THIS MEMORANDUM DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL OF THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN EVALUATING AN INVESTMENT IN THE COMPANY.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME, NOR ANY SALE OF THE UNITS HEREUNDER, SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED IN THIS MEMORANDUM IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE ARE SPECULATIVE SECURITIES, WHICH INVOLVE A HIGH DEGREE OF RISK. ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THESE UNITS. THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), THE SECURITIES LAWS OF THE STATE OF FLORIDA OR UNDER THE SECURITIES OF ANY OTHER STATE OR JURISDICTION IN RELIANCE UPON THE EXEMPTIONS FROM REGISTRATION PROVIDED BY THE ACT AND SECTION 4(6) PROMULGATED THEREUNDER, AND THE COMPARABLE EXEMPTIONS FROM REGISTRATION PROVIDED BY OTHER APPLICABLE SECURITIES LAWS.

(1) THE OFFERING IS NOT UNDERWRITTEN. TSUNAMI ENTERTAINMENT LLC (THE "COMPANY") THROUGH ITS MANAGING MEMBER (THE "MANAGING MEMBER"), OFFERS THE UNITS ON A "BEST EFFORTS" BASIS.

(2) THE OFFERING WILL TERMINATE ON THE EARLIEST OF: (A) SEPTEMBER 15, 2006 OR SUCH DATE AS THE COMPANY MAY AMEND FROM TIME TO TIME OR (B) UPON THE SALE OF ALL UNITS OFFERED HEREIN.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE COMPANY'S LIMITED LIABILITY COMPANY AGREEMENT AND UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE

AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THIS "MEMORANDUM") DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR MAY NOT LAWFULLY BE MADE.

THERE IS NO PUBLIC OR OTHER MARKET FOR THESE SECURITIES, NOR IS IT LIKELY THAT ANY SUCH MARKET WILL DEVELOP. THEREFORE, INVESTORS MUST EXPECT TO RETAIN OWNERSHIP OF THE SECURITIES AND BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED NOR SHOULD ANY BE INFERRED WITH RESPECT TO THE ECONOMIC VIABILITY OF THIS INVESTMENT OR WITH RESPECT TO ANY BENEFITS WHICH MAY ACCRUE TO INVESTMENT IN THE COMPANY. THE COMPANY, ITS MANAGING MEMBER AND EMPLOYEES, DO NOT IN ANY WAY REPRESENT, GUARANTEE OR WARRANT AN ECONOMIC GAIN OR PROFIT WITH REGARD TO THE COMPANY'S BUSINESS OR THAT FAVORABLE INCOME TAX CONSEQUENCES WILL FLOW THEREFROM. ANY PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OR OPINIONS CONTAINED HEREIN, WHETHER OR NOT IDENTIFIED AS SUCH, CONSTITUTE ESTIMATES BY THE COMPANY BASED UPON SOURCES DEEMED TO BE RELIABLE, BUT THE ACCURACY OF SUCH INFORMATION IS NOT GUARANTEED NOR SHOULD THE INFORMATION BE CONSIDERED ALL INCLUSIVE.

## State Statutes: Information for Residents of Certain States

Every prospective investor should read this legend and/or state disclosures listed below which is applicable to the State in which he/she resides. The State disclosures below do not in any way constitute or imply that offers or sales may be made in such States. Offers and/or sales may be made in those States approved by the Company.

## All States

THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED AS A MEANS TO AN OFFER OR SALE MADE IN ANY PARTICULAR STATE. THIS MEMORANDUM MAY BE SUPPLEMENTED BY ADDITIONAL LEGENDS. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES CAN BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE ADVISED TO CONTACT THE COMPANY FOR ANY CURRENT LIST OF

STATES IN WHICH OFFERS AND SALES MAY LAWFULLY BE MADE. THIS MEMORANDUM MAY BE SUPPLEMENTED BY ADDITIONAL STATE LEGENDS.

## For CALIFORNIA Residents Only:

ANY OFFER OR SALE OF A SECURITY IN A TRANSACTION (OTHER THAN AN OFFER OR SALE TO A PENSION OR PROFIT SHARING TRUST OF THE ISSUER) WHICH MEETS EACH OF THE FOLLOWING CRITERIA:  SALES ARE NOT MADE TO MORE THAN 35 PERSONS (EXCLUDING ANY OFFICER, DIRECTOR, OR AFFILIATE OF THE ISSUER AND ANY PURCHASER WHO THE COMMISSIONER DESIGNATES BY RULE); ALL PERSONS (NOT INCLUDING THOSE PURCHASERS DESCRIBED BELOW WHICH ARE EXCLUDED FROM THE COUNT OF 35) MUST EITHER HAVE A PRE-EXISTING RELATIONSHIP WITH THE OFFEROR OR ANY OF ITS PARTNERS, OFFICERS, DIRECTORS, OR CONTROLLING PERSONS, OR BY REASON OF THEIR BUSINESS OR FINANCIAL EXPERIENCE OR THE BUSINESS OR FINANCIAL EXPERIENCE OF THEIR PROFESSIONAL ADVISORS WHO ARE UNAFFILIATED WITH AND WHO ARE NOT COMPENSATED BY THE ISSUER OR ANY AFFILIATE OR SELLING AGENT OF THE ISSUER, COULD BE REASONABLY ASSUMED TO HAVE THE CAPACITY TO PROTECT THEIR OWN INTERESTS IN CONNECTION WITH THE TRANSACTION. THE PURCHASER MUST REPRESENT THAT HE IS PURCHASING FOR HIS OWN ACCOUNT (OR A TRUST ACCOUNT IF HE IS A TRUSTEE) AND NOT WITH A VIEW TO OR FOR SALE IN CONNECTION WITH THE OFFER AND SALE OF THE SECURITY; AND NO ADVERTISING IS USED IN CONNECTION WITH THE OFFER AND SALE OF THE SECURITY. A NOTICE, CONSENT TO SERVICE OF PROCESS, AND A FILING FEE MUST BE FILED WITH THE COMMISSIONER NO LATER THAN FIFTEEN (15) CALENDAR DAYS AFTER THE FIRST SALE OF A SECURITY IN THIS STATE. IF IN CONNECTION WITH THE TRANSACTION THE ISSUER IS FILING A NOTICE WITH THE SECURITIES AND EXCHANGE COMMISSION PURSUANT TO SECTION 4(6) OR REGULATION D, THE NOTICE TO CALIFORNIA MAY BE A COPY OF THE FORM FIRST FILED PURSUANT TO SECTION 4(6) OR REGULATION D. OTHERWISE, THE NOTICE SHALL BE IN THE FORM SPECIFIED IN THE CALIFORNIA CODE. NO NOTICE IS REQUIRED IF NONE OF THE SECURITIES ARE PURCHASED.

## For FLORIDA Residents Only:

THESE SECURITIES WILL BE SOLD TO, AND ACQUIRED BY, THE INVESTOR IN A TRANSACTION EXEMPT UNDER THE FLORIDA SECURITIES ACT. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THAT ACT IN THE STATE OF FLORIDA.  IN ADDITION, THE FLORIDA SECURITIES ACT PROVIDES THAT WHERE SALES ARE MADE TO FIVE OR MORE FLORIDA INVESTORS, ALL FLORIDA INVESTORS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE DAYS AFTER THE FIRST TENDER

iv

OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

### For ILLINOIS Residents Only:

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED ON THE ACCURACY OR ADEQUACY OF THE PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

### For MINNESOTA Residents Only:

THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

### For NEW YORK Residents Only:

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMITS TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY ARE MADE NOT MISLEADING. THE MEMORANDUM CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS OF DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

### For TEXAS Residents Only:

IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY SECURITY, THE INVESTOR IS HEREBY ADVISED THE SECURITY WILL BE SOLD TO OR ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE TEXAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

April 15, 2006

## IMPORTANT GENERAL INFORMATION

This Memorandum does not constitute an offer or solicitation to anyone in any jurisdiction in which such an offer or solicitation is not authorized or may not lawfully be made.

The limited liability company membership interests (the "Interests") offered hereby which are being sold in units (the "Units"), have not been registered or qualified under any federal or state securities law and are being offered and sold in reliance on exemptions from the registration and qualification requirements of those laws.

The securities offered by this Memorandum will be sold to a limited number of accredited investors (as defined under federal and applicable state securities laws) meeting certain suitability standards. Investors will be required to represent that they are familiar with and understand the terms, risks and merits of the securities offered under this Memorandum (the "Offering") as described in this Memorandum and all of the attachments hereto.

Before investing in this Offering, you should carefully read this entire Memorandum and consult your own counsel, accountants and other professional advisers as to legal, tax, accounting and related matters concerning your investment in the Units and its suitability for you. Any investment in the Company involves a high degree of financial risk. Accordingly, you should carefully consider all of the risk factors relating to this Offering beginning on page fifteen, and elsewhere throughout, this Memorandum. This Offering is intended only for persons who can afford to lose all of their investment in the Units.

The Units will be offered and sold only to persons representing in writing that they satisfy these and other criteria set forth in the form of Subscription Agreement attached as Exhibit A hereto.

The information herein is furnished on a confidential basis for use only by the prospective purchaser named on the cover page hereof and by his personal advisers. Prospective purchasers are not to construe the contents or any related documents as legal, investment or tax advice and should consult such advisers as they deem appropriate concerning an investment in the Company.

No person is authorized to give any information or to make any representation not contained in the Memorandum without the prior written consent of the Company. Neither the delivery of this Memorandum nor any offers or sales hereunder shall imply that there has been no change since the date of the Memorandum in the matters disclosed herein or in the Appendices or Exhibits hereto.

# TABLE OF CONTENTS

NOTICE TO ALL INVESTORS                                          1
INTRODUCTION AND SUMMARY                                         5
THE OFFERING                                                    11
BUSINESS                                                        13
DESCRIPTION OF SECURITIES                                       13
DISTRIBUTION POLICY                                             13
PLAN OF DISTRIBUTION                                            14
RISK FACTORS                                                    15
USE OF PROCEEDS                                                 22
MANAGEMENT                                                      23
LEGAL MATTERS                                                   28
TAX ASPECTS                                                     29
MISCELLANEOUS                                                   35
ADDITIONAL INFORMATION                                          36

## EXHIBITS

A.     Form of Subscription Agreement

B.     Operating Agreement of Tsunami Entertainment LLC

# NOTICE TO ALL INVESTORS:

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF TSUNAMI ENTERTAINMENT LLC (THE "COMPANY") AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. IF RELIANCE OF INVESTOR DECISION IS MADE BY PURCHASER REPRESENTATIVE, DISCLOSURE MUST BE MADE AT THE TIME OF SUBSCRIPTION AND A SEPARATE DISCLOSURE AGREEMENT MUST BE SIGNED BOTH BY THE SUBSCRIBER AND PURCHASER REPRESENTATIVE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED IN THE COMPANY'S LIMITED LIABILITY COMPANY AGREEMENT (THE "LLC AGREEMENT") AND UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

No person is authorized to give any information or to make any representation not contained in this Confidential Private Placement Memorandum (the "Memorandum") and any information or representation not contained herein must not be relied upon. Nothing in this Memorandum should be construed as legal or tax advice. The Company's Managing Member (the "Managing Member") has provided all the information herein. The Company makes no express or implied representation or warranty as to the completeness of this information or, in the case of projections, estimates, future plans, or forward looking assumptions or statements, as to their attainability or the accuracy and completeness of the assumptions from which they are derived, and it is expected that each prospective investor will pursue his, her, or its own independent investigation. It must be recognized that estimates of the Company's performance are necessarily subject to a high degree of uncertainty and may vary materially from actual results.

Except as otherwise indicated, this Memorandum speaks only as of the date hereof. Neither the delivery of this Memorandum, nor any sale hereunder, shall create, under any circumstances, any implication that there has been no change in the affairs of the Company and other information contained herein.

Other than the Company's management, no one has been authorized to give any information or to make any representation with respect to the Company or the Units that is not contained in this Memorandum. Prospective investors should not rely on any information not contained in this Memorandum.

This Memorandum does not constitute an offer to sell or a solicitation of an offer to buy to anyone in any jurisdiction in which such offer or solicitation would be unlawful or is not authorized or in which the person making such offer or solicitation is not qualified to do so. This Memorandum does not constitute an offer if the prospective investor is not qualified to do so. This Memorandum does not constitute an offer if the prospective investor is not qualified under applicable securities laws. The Company without notice and solely at the Company's discretion makes this offering of the Units (the "Offering") subject to withdrawal, cancellation or modification. The Company reserves the right to reject any subscription or to allot to any prospective investor. This Memorandum has been prepared solely for the information of the person to whom this Memorandum is delivered by the Company and those persons retained to advise them with respect thereto. Any reproduction of this Memorandum, in whole or in part, or the divulgence of any of the contents without the prior written consent of the Company is strictly prohibited. Each prospective investor, by accepting delivery of this Memorandum, agrees to return it and all other documents received by it to the Company if the prospective investor's subscription is not accepted or if the Offering is terminated. By acceptance of this Memorandum, prospective investors recognize and accept the need to conduct their own thorough investigation and due diligence before considering a purchase of the Units. The contents of this Memorandum should not be considered to be investment, tax, or legal advice and each prospective investor should consult with their own counsel and advisors as to all matters concerning an investment in this Offering.

During the course of the Offering and prior to any sale, each offeree of the Units and his or her professional advisor(s), if any, are invited to ask questions concerning the terms and conditions of the Offering and to obtain any additional information necessary to verify the accuracy of the information set forth herein. Such information will be provided to the extent the Company possesses such information or can acquire it without unreasonable effort or expense.

Certain provisions of various agreements are summarized in this Memorandum, but prospective investors should not assume that the summaries are complete. Such summaries are qualified in their entirety by reference to the texts of the original documents, which may be made available to prospective investors by the Company.

EACH PROSPECTIVE INVESTOR WILL BE GIVEN AN OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, MANAGEMENT OF THE COMPANY CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORTS OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. IF YOU HAVE ANY QUESTIONS WHATSOEVER REGARDING THIS OFFERING, OR DESIRE ANY ADDITIONAL INFORMATION OR DOCUMENTS TO VERIFY OR SUPPLEMENT THE INFORMATION CONTAINED IN THIS MEMORANDUM, PLEASE WRITE OR CALL:

**TSUNAMI ENTERTAINMENT LLC**
455 N Cityfront Plaza Drive #1420
Chicago, Illinois 60611
Telephone: (312) 836-0001
Facsimile: (312) 836-1118

-2-

# TSUNAMI ENTERTAINMENT LLC

## CONFIDENTIAL OFFERING MEMORANDUM

The information contained herein is confidential and private. It is for the exclusive use of persons selected by Tsunami Entertainment LLC. This Memorandum may not be reproduced or circulated to any persons other than those selected by Tsunami Entertainment LLC, with the exception that such recipients may show it to their professional advisors. This Memorandum must be returned upon the request by the Managing Member.

Memorandum Number: _____

Furnished to _____ on _____ 2006.

THE MEMBERSHIP INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED WITH NOR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR THE REGULATORY AUTHORITY OF ANY STATE, NOR HAS SUCH COMMISSION OR ANY REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

Tsunami Entertainment LLC is offering for sale membership interests (the "Interests"), which are being sold in units (the "Units"), at a cash price of one hundred thousand ($100,000) dollars per Unit on the terms and conditions provided in this Memorandum. No sales commission is charged to purchasers of these Units, therefore, all sales proceeds are paid to the Company. The Company may, from time to time, employ sellers that could be paid selling commissions. The minimum subscription amount shall be one hundred thousand ($100,000) dollars per Unit. However, the Company may accept smaller investments at the Managing Member's discretion. All proceeds from the sale of the Units will be deposited in a non-interest bearing account maintained by New Century Bank, as escrow agent for the Company, which will be held in escrow until the receipt of the Minimum Offering Amount.

| | |
|---|---|
| Price per Unit: | One hundred thousand ($100,000) dollars (one Unit) |
| Minimum Offering: | One million fifty thousand ($1,050,000) dollars (10.5 Units) (the "Minimum Offering Amount") |
| Maximum Offering: | One million seven hundred thousand ($1,700,000) dollars (seventeen Units) |

| Investment Class | Amount of Investment | Proceeds to Company |
|---|---|---|
| Class "A" | | |
| Minimum Investment Per Member | $100,000 | $100,000 |

The date of this Offering Memorandum is April 15, 2006.

**Tsunami Entertainment LLC**
455 N Cityfront Plaza Drive #1420
Chicago, Illinois 60611
Telephone: (312) 836-0001
Facsimile: (312) 836-1118

- 4 -

# INTRODUCTION AND SUMMARY

## FORWARD-LOOKING INFORMATION

This Memorandum contains certain forward-looking statements or statements that may be deemed or construed to be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, if applicable, with respect to the financial condition and business of the Company. The words "estimate," "plan," "intend," "expect" and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve, and are subject to, known and unknown risks (including the ones set forth herein), uncertainties and other factors that could cause the Company's actual results, performance (financial and operating) or achievements to differ from future results, performance (financial or operating) or achievements expressed or implied by such forward-looking statements. Investors are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. The Company notes that a variety of factors could cause the Company's actual results to differ materially from the anticipated results or other expectations expressed in the Company's forward-looking statements. The risks and uncertainties that may affect the operations, performance, development, and results of the Company's business include those set forth under "Risk Factors" in this Memorandum.

The following summary is qualified in its entirety by, and should be read in conjunction with, the Exhibits and Appendices attached hereto, including without limitation, the Company's LLC Agreement and the more detailed information and financial statements and related notes thereto accompanying the Memorandum. Each prospective investor is urged to read this Memorandum and the Exhibits and Appendices hereto in their entirety before making any investment decision. In addition, prospective investors should consult their own advisors in order to understand fully the consequences of an investment in the Company.

General:

Tsunami Entertainment LLC (the "Company") is an Illinois limited liability company. Tsunami Entertainment LLC is an innovative company that intends to purchase an existing restaurant venue and develop the property into a new and exciting food, drink and gathering place targeted to a mixture of young urban professionals who are looking for an entertainment establishment that compliments their lifestyle. The address and telephone number of Tsunami Entertainment LLC, and its Managing Member, is 455 N Cityfront Plaza Drive, #1420, Chicago, Illinois, 60611; telephone: (312) 836-0001; facsimile: (312) 836-0001.

Returns on investment ("ROI") shall be based on the Class of Units.

(a) First, TO BE PAID QUARTERLY. Class B member(s) shall receive the first twenty (20%) percent of net profits. Thereafter, Class A member(s) shall receive the remaining eighty (80%) percent of net profits until such member(s) has received an aggregate amount equal to one hundred (100%) percent of its initial capital contribution.

(b) Thereafter, TO BE PAID BI-ANNUALLY. Class B member(s) shall receive the first twenty (20%) percent of net profits. Thereafter, the remaining Eighty (80%) of net profits shall be split Fifty (50%) percent to Class A member(s) and Thirty (30%) percent to Class B member(s).

(c) In the event management can establish an agreement with Adam Goldstein (AKA DJ AM) (the "Artist") to provide residency DJ services, Class B member(s) and Class A member(s) mutually agree to offer Artist a to be determined equity interest. This Interest shall be split equally between Class B member(s) and Class A member(s). *This provision shall be negotiated and is subject to unanimous approval from all Members.*

(d) In the event management can establish an agreement with Phil Stefani to provide services for the Company, Class B member(s) and Class A member(s) mutually agree to offer Mr. Stefani a to be determined equity interest. This Interest shall be split equally between Class B member(s) and Class A member(s). *This provision shall be negotiated and is subject to unanimous approval from all Members.*

Management:

The Company's Managing Member is Tsunami Capital, LLC. The principals of the Managing Member are Anthony Demasi and Eoin Callery. The Managing Member will run the day-to-day operations of the Company. The other members will have no right to participate in the management of the Company, except to vote on matters specifically provided under applicable law or in the LLC Agreement. See "Management" located at page twenty-three. The Managing Member's address is 455 N Cityfront Plaza Drive, #1420, Chicago, Illinois, 60611; Telephone: (312) 836-0001, Facsimile: (312) 836-0001.

Management Group:

In addition to the Principals of the Managing Member, Brian Hartwell, Nicholas Demasi, Matthew Mering, and

- 6 -

|                          | Ryan Preuett comprise the Management Group. See "Management" located on page twenty-three. |
|--------------------------|---|
| Minimum Offering:        | One million fifty thousand ($1,050,000) dollars (10.5 Units) |
| Price Per Unit:          | One hundred thousand ($100,000) dollars (one Unit) |
| Maximum Offering:        | One million seven hundred thousand ($1,700,000) dollars (seventeen Units) |
| Minimum Investment:      | One Unit.  The Company reserves the right to accept subscriptions for fractional Units. |
| Sales to Investors:      | The offering of Units has not been registered under the Securities Act and the Units are being offered in reliance upon the exemption from registration under Rule 506 of the Securities Act and the provisions of Regulation D promulgated hereunder ("Regulation D").  Sales of the Units will be made only to "accredited investors" as such term is defined in Rule 501(a) of Regulation D under the Securities Act.  Subscribers will be required to submit a completed and executed Subscription Agreement in the form attached as Exhibit A.  Moreover, investors shall execute the Limited Liability Company Agreement in the form attached as Exhibit B to become members of the Company (each, a "Member" and collectively, the "Members"). |
| Absence of Market:       | No trading market currently exists for the Membership Units and it is not anticipated that an active market, if any, will develop for the Membership Units for a substantial period of time after the consummation of this Offering. The Membership Units will be "restricted securities" under the Securities Act and may not be resold absent registration, or an available exemption hereunder, such as Rule 144 promulgated under the Securities Act, assuming certain conditions are satisfied.  There can be no assurances that these conditions will ever be met. |
| Terms of the Offering:   | The Units constituting the Minimum Offering Amount are being offered on a "best efforts basis."  The Company may refuse any subscription, in whole or in part.  There is no assurance that any or all of the Units will be sold.  The Offering will expire on the earlier to occur of (1) September 15, 2006, unless extended by the Company in its |

- 7 -

sole discretion for up to an additional ninety (90) calendar days (collectively, the "Termination Date") or (2) the sales of all the Units offered hereby. The Company's initial closing will occur as soon as practicable following the receipt of subscriptions amounting to at least $1,050,000 (10.5 UNITS). Subsequent closings may be held at the discretion of the Managing Member.

**Escrow Amount:**

All funds paid for the Units will be deposited in a non-interest bearing account maintained for the Company by New Century Bank. The minimum aggregate investment required before the Company is obligated to close on the Offering is one million fifty thousand ($1,050,000) dollars. If one million fifty thousand ($1,050,000) dollars is not raised within six (6) months from the date of this Offering, all subscriptions will be returned without interest by not later than ninety (90) calendar days. The Managing Member expressly reserves the right to extend this period by an additional ninety (90) calendar days in which to raise the aggregate minimum investment. In the event that the aggregate minimum investment is not raised during this extended period, all subscriptions will be returned to investors within thirty (30) calendar days following the last day of this extension.

**Risk Factors:**

An investment in the Units offered hereby involves a high degree of risk. Prospective investors should review carefully the information concerning "Risk Factors" and should be able to withstand the loss of their entire investment. See "Risk Factors" located at page fifteen.

**Use of Proceeds:**

At and after the initial closing, all proceeds will be delivered directly to the Company's corporate account and be available for use by the Company at its discretion. See "Use of Proceeds" located at page twenty-two.

**Capital Accounts:**

The Company shall establish and maintain "Capital Accounts" for each Member throughout the full term of the Company in accordance with the terms as stated in the Company's Limited Liability Company Agreement.

**Distributions:**

Holders of Membership Units are only entitled to distributions if declared by the Managing Member out of funds legally available therefore. The Company has never made any such distributions. Future distribution policy is subject to the discretion of the Managing Member and will

depend upon a number of factors, including among other things, the capital requirements and the financial condition of the Company.

**Subscription Procedure:** Prospective, suitable investors intending to subscribe to purchase Units offered hereby should complete, sign and deliver (1) the Subscription Agreement, in the form, attached as Exhibit A containing, among other provisions representations and warranties, and investment representations by the subscriber that the subscriber is an accredited investor and indemnification relating to breaches of representations and warranties by the subscriber and, (2) the counterpart signature page to the Limited Liability Company Agreement, in the form, attached as Exhibit B, containing among other provisions, the provisions governing capitalization, allocation of profits and losses, distributions, management, tax treatment and restrictions on transferability of the Membership Units. In addition, a check made payable to New Century Bank, escrow agent for Tsunami Entertainment LLC or a wire transfer of funds for the total dollar value (USD United States Dollars) of the number of Units purchased shall be transmitted to New Century Bank at 363 W. Ontario Street, Chicago, IL 60610. Fully completed and duly executed documents (other than the payment for the Units) should be delivered or sent to Tsunami Entertainment LLC, 455 N Cityfront Plaza Drive #1420, Chicago, Illinois 60611.

**Expenses:** <u>Offering and Organizational Expenses</u>. Investors will not be required to pay any sales commissions in connection with this Offering. The Company will pay all organizational and offering expenses including, but not limited to, attorney's fees, accountant's fees and filing fees.

<u>Operating Expenses</u>. The Company will be responsible for the payment of its ongoing operating expenses, including but not limited to, ordinary accounting, auditing and legal expenses, and periodic bank service charges.

**Legal Counsel (Liquor):** Samuel V.P. Banks, Esq., Law office of Samuel V.P. Banks, 221 N. LaSalle Street; 38th Floor, Chicago, Illinois 60601. Telephone: (312) 782-1983.

**Legal Counsel:** Anthony A. Demasi, Esq., 455 N Cityfront Plaza Drive, Suite 1420, Chicago, Illinois 60611. Telephone: (312) 836-0001.

- 9 -

| | |
|---|---|
| Conflicts of Interest: | The Company, its members and affiliates are engaged in other activities, including investment activities, apart from their operation of the Company, and devote to the Company only so much of their time as they believe is appropriate in connection with the Company's activities. |
| | The Company is not independently managed and must rely upon the Managing Member for the operation of its affairs and the management of its capital. |
| Salaries: | General Manager:  The general manager shall be paid a salary equal to fair market value as deemed appropriate in the industry.  In addition, a bonus may be paid at discretion of the Managing Member. |
| Chief of Operations: | The chief of operations shall be paid a salary equal to fair market value as deemed appropriate in the industry and shall be responsible for the start up and continued operating relationships of the Company.  In addition, a bonus may be paid at discretion of the Managing Member. |
| Marketing/Event Planner: | The Marketing Event Planner shall be paid a salary equal to fair market value as deemed appropriate in the industry and shall be responsible for booking private parties and marketing of the venue.  In addition, a bonus may be paid at discretion of the Managing Member. |
| Executive Chef: | The Executive Chef shall be paid a fair market salary.  The Chef responsibilities will be to run and manage a small kitchen featuring a range of entrées.  In addition, a bonus may be paid at discretion of the Managing Member. |
| Taxation: | The tax consequences of an investment in the Company are complex; prospective investors should consult their own tax counsel before investing.  See "Tax Aspects" located at page twenty-nine. |
| Membership Units Outstanding: | The Class B Member(s) of the Company prior to this Offering have been issued Membership Units in the LLC Agreement to represent their percentage ownership interests in the Company. |

# THE OFFERING

## *Size of Offering and Minimum Subscription Amount*

The Company is offering Membership Units of the Company in the Form of Units pursuant to Section 4(2) of the Securities Act. Investors are required to invest a minimum of one hundred thousand ($100,000) dollars for the purchase of one (1) Unit. However, the Managing Member may waive the minimum subscription requirement and can reject any subscription in whole or in part in its sole discretion.

The Company hereby offers to accredited investors an aggregate of $1,700,000 of Units. The minimum aggregate investment required before the Company is obligated to close on the Offering is one million fifty thousand ($1,050,000) dollars. If one million fifty thousand ($1,050,000) dollars is not raised within six (6) months from the date of this Offering, all subscriptions will be returned without interest by not later than ninety (90) calendar days. The Managing Member expressly reserves the right to extend this period by an additional ninety (90) calendar days in which to raise the Minimum Offering Amount. In the event that the Minimum Offering Amount is not raised during this extended period, all subscriptions will be returned to investors within thirty (30) calendar days following the last day of this extension. There is no maximum amount of Membership Units in the Company for which an investor may subscribe, subject to the right of the Managing Member in its sole discretion to reduce the amount of a subscription prior to acceptance.

The Company will continuously offer Units until the Minimum Offering Amount is reached. Any subscriptions received and approved by the Managing Member will become effective on the date of deposit.

## *LLC Agreement*

Each prospective investor that is not currently a member of the Company will be required to execute the LLC Agreement and be bound by the terms of the LLC Agreement.

## *Transferability*

Members may not sell, assign or transfer (nor offer to sell, assign, or transfer) their Membership Units in the Company without the express written consent of the Managing Member, which may be withheld in the Managing Member's sole discretion. Any sale, exchange or other transfer by any Member of any Membership Units must comply with the terms as stated in the LLC Agreement. Moreover, any sale, exchange or other transfer by any Member of any Membership Units that is not approved in writing by the Managing Member shall be void and ineffective, and shall neither bind nor be recognized by the Company or any other party. No purported assignee shall have any right to any profits, losses or distributions of the Company.

## *Investor Suitability Standards*

- 11 -

This Offering is limited to subscribers who satisfy the following requirements:

(a) Reside in a state in which these securities may be sold under an exemption from registration;

(b) Are purchasing solely for their own account with the intention to hold the Membership Units for investment rather than for resale; and

(c) Are either (i) an individual who has a net worth, or joint net worth with his or her spouse, at the time of the purchase, that exceeds $1,000,000; (ii) an individual who has an income in excess of $200,000 in each of the two most recent years or joint income with his or her spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; (iii) a corporation, business trust or partnership with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Units offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D; (iv) an entity in which all of the equity owners are accredited investors as that term in defined in Regulation D; or (v) an otherwise qualified accredited investor as defined in Regulation D.

We have adopted as a general investor suitability standard the requirement that each subscriber for the Units represent in writing, in addition to other representations (the "Investor Representations"), that (i) he is acquiring the Units for his own account, for investment and not with a view to resale or distribution; (ii) he is capable of evaluating the merits and risks of an investment in the Units and can bear the economic risk of losing his entire investment; (iii) he is an accredited investor as that term in defined in Regulation D; and (iv) he is not utilizing any other person as his Purchaser Representative (as such term is defined in Rule 501(h) of Regulation D).

These suitability standards represent minimum suitability requirements for a prospective purchaser and the satisfaction of such standards by a prospective purchaser does not necessarily mean that the Units are a suitable investment for the prospective investor. Each prospective investor should consider whether the purchase of the Units is suitable for him in the light of his individual investment objectives and his present and expected future financial and tax position and needs. Each prospective investor is urged to consult a qualified, independent tax and investment advisor and his attorney. Nothing herein shall be construed as the rendering of investment advice on our part.

**This investment involves a high degree of risk, is speculative and contains restrictions on transferability of the Units. See "Risk Factors" and "Description of Securities."**

We have the absolute right in our sole discretion to accept or reject in whole or in part any subscription submitted to us. We shall incur no liability for such rejection or for the exercise of such discretion. The minimum investment that will be accepted from any

individual investor is one hundred thousand ($100,000) dollars, although the minimum amount may be waived by the Company.

### *Determination of Offering Price*

The Offering price has been arbitrarily determined by the Company, is not based on earnings and is not a representation that the Membership Units have a market value or can be sold at that price.

## BUSINESS

Tsunami Entertainment LLC is an innovative company that intends to purchase an existing restaurant venue and develop the property into a new and exciting food, drink and gathering place targeted to a mixture of young urban professionals who are looking for an entertainment establishment that compliments their lifestyle. The Company intends to purchase an established restaurant near the busy intersection of Ontario and Franklin. Once the sale is closed the Company intends to immediately begin demolition and remodel the property into a sleek new, customer friendly eating and drinking establishment. A contract has been signed on the property and the Company intends to close on or before June 1, 2006. This new establishment is anticipated to re-open during the third quarter 2006.

## DESCRIPTION OF SECURITIES

The number of Membership Units issued and outstanding is described fully in the LLC Agreement attached hereto as Exhibit B.

The Company's Membership Units are subject to the provisions of the LLC Agreement, attached as Exhibit B hereto. Our Managing Member and our corporate governance are described in the LLC Agreement. In general, management is vested solely in our Managing Member (as opposed to the Members) and the holders of Membership Units do not have the right to vote on any matters concerning the Company, except as required by applicable law or as set forth in the LLC Agreement. Our day-to-day business affairs are conducted by the Managing Member. We intend to maintain the current structure of our corporate government upon consummation of the Offering. The LLC Agreement contains specific restrictions on transfer of the Membership Units.

The foregoing statements do not purport to be complete and are qualified in all respects by reference to the actual text of the LLC Agreement, which text is incorporated herein by reference and should be read in its entirety.

## DISTRIBUTION POLICY

Holders of Membership Units are only entitled to distributions if declared by the Managing Member out of funds legally available therefore. The Company has never made any such distributions. Future distribution policy is subject to the discretion of the

- 13 -

Managing Member and will depend upon a number of factors, including among other things, the capital requirements and the financial condition of the company.

In the event of dissolution, liquidation or winding up of the Company, the assets then legally available for distribution to the holders of Units will be distributed ratably among such holders in proportion to their percentage interest in the Company.

### Options and Warrants

The Company does not currently have any outstanding options or warrants to purchase Membership Units or a Membership Unit incentive option plan, nor is one envisioned at this time.

### Transfer Restrictions

Pursuant to the terms of the LLC Agreement, except for certain permitted transfers to an affiliate of a Member, no transfers of the Company's Membership Units may be made other than with the prior written consent of its Managing Member, which consent may be granted or withheld in the Managing Member's sole discretion.

The following is a brief summary of the transfer restrictions in the LLC Agreement. You should read the LLC Agreement in its entirety before making a decision in purchase the Units.

## PLAN OF DISTRIBUTION

The Units are offered directly by the Company's Managing Member on the terms and conditions set forth in this Memorandum. The Company is offering the Units on a "best efforts" basis. The Company will use its best effort to sell the Units to investors. There can be no assurance that all or any of the Units will be sold. This is a private offering and no advertising or sales material other than this Memorandum will be used. Reproduction or circulation of any part of this Memorandum without the prior written consent of the Managing Member is prohibited.

*The name, address and telephone number of the independent bank acting as escrow agent for the proceeds escrowed until the minimum proceeds ($1,050,000) are raised is as follows:*

New Century Bank
363 W. Ontario Street
Chicago, Illinois 60610
Telephone: (312) 944-5400
Facsimile: (312) 944-0555

*Date at which escrow agent will return funds if minimum proceeds are not raised*

- 14 -

The minimum aggregate investment required before the Company is obligated to close on the Offering is one million fifty thousand ($1,050,000) dollars. If one million fifty thousand ($1,050,000) dollars is not raised within six (6) months from the date of this Offering, all subscriptions will be returned without interest by not later than ninety (90) calendar days. The Managing Member expressly reserves the right to extend this period by an additional ninety (90) calendar days in which to raise the Minimum Offering Amount. In the event that the Minimum Offering Amount is not raised during this extended period, all subscriptions will be returned to investors within thirty (30) calendar days following the last day of this extension. Because any investment in the Units offered hereby involves a high degree of risk, only accredited investors who can accommodate such risks, including a complete loss of their investment, should purchase the Units.

The Company will continuously offer Units until the Minimum Offering Amount ($1,050,000) is reached. Any subscriptions received and approved by the Managing Member will become effective on the date of deposit.

## RISK FACTORS

The following risk factors should be considered carefully in addition to the other information contained in this Memorandum before purchasing the Units offered hereby. Because any investment in the Units offered hereby involves a high degree of risk, only investors who can accommodate such risks, including a complete loss of their investment, should purchase the Units. The risks described below and elsewhere in this Memorandum are not intended to be an exhaustive list, but merely identify certain risks that are now foreseen by the Company. Additional risks and uncertainties may also adversely impair our business operations. If any of the following risks actually occur, our business, financial condition or results of operations would likely be significantly harmed.

### Return of Investor's Capital Contributions

The Membership Units offered hereby are speculative and involve a high degree of risk. There can be no guarantee that an investor will realize a return on the investment, or that he or she will not lose the entire investment. For this reason, each prospective investor should read this Memorandum carefully and should consult with his or her own legal counsel, accountant(s), or business advisor(s) prior to making any investment decision.

### Uncertainty of Profitability

There can be no assurance that the Company will generate revenues and control expenses so as to produce profits. Future operating results will depend on many factors, including demand for the Company's products and services, the Company's ability to develop a new market niche, the Company's ability to obtain and maintain contracts with its clients, the level of competition, and the Company's ability to respond to competitive developments. There can be no assurance that the Company will be successful in addressing the risks presented by such factors.

- 15 -

### Best Efforts Offering

This Offering is being conducted on a "best efforts" basis by the Company's Managing Member. No guarantee can be given that all or any of the Units will be sold, or that sufficient proceeds will be available to conduct successful operations without the need for further financing if only a portion are sold.

### No Guarantee of Profitable Operations

Although the Company believes in the venture's economic viability, there can be no guarantee that the business will be profitable. Success of the venture is completely dependent upon the extent that the Company is able to operate the venture in accordance with expectations and assumptions as set forth in this Memorandum. Furthermore, to the extent the Company's business strategy is successful, the Company must manage the transition to higher volume operations and control overhead expenses and the addition of necessary personnel.

### Capital Requirements

The Company may encounter unforeseen costs that could also require us to seek additional capital. We cannot assure you that any additional financing we will need will be available to us on favorable terms or at all. Any additional financing could result in a substantial dilution to investors purchasing Units in this Offering. If we are unable to raise sufficient capital to implement our business plan, we could be forced to sell the Company prematurely to pay off our debts as they mature.

### Conflicts of Interest

The Company, the Managing Member and its members and affiliates are engaged in other activities, apart from their operation of the Company, and devote to the Company only so much of their time as they believe is appropriate in connection with the Company's activities.

The Company is not independently managed and must rely upon the Managing Member for the operation of its affairs and the management of its capital.

### Tax Status of Limited Liability Companies

The Managing Member has been advised by its counsel that the Company will be classified as a partnership for federal income tax purposes. This advice, however, is not binding on the Internal Revenue Service ("IRS"), and no ruling has been or will be sought from the IRS on this or any other tax issue affecting the Company or the members. The facts and authorities relied upon by the Company's counsel, including certain representations made by the Company, may change in the future. This advice also is subject to the Company's compliance with rules to prevent the Company from being taxed as a publicly-traded partnership. A more detailed discussion of the Company's

- 16 -

status, including the potential consequences of recharacterization of the Company's status as a corporation for federal income tax purposes, set forth below under the heading "Tax Aspects" located at page thirty-nine.

## *Absence of Securities Registration/Limited Transferability*

This Offering has not been registered under the Securities Act or under the securities law of any other applicable jurisdiction in reliance on exemptions from registration under such laws. As a result, the transfer of Membership Units to third parties is subject to legal restrictions as well as restrictions on transferability set forth in the LLC Agreement of the Company attached as Exhibit B.

## *Arbitrary Determination of Offering Price*

The offering price of the Units being offered herein was arbitrarily determined and has no basis or relationship to the Company's assets, book value, earnings, or other established criteria of value. In determining the offering price such factors as the limited financial resources of the Company, the nature of the Company's assets, estimates of the business potential of the Company, the amount of equity control desired to be retained by the Company's existing Members, the amount of dilution to investors, and the general conditions of the securities market were considered.

## *Competition*

There can be no guarantee that the Company will be able to secure a profitable niche in the industry, or that the Company will not be adversely affected by the present or future existence of direct or indirect competition in the Company's markets. In addition, many of our competitors have well-established relationships with our potential customers and extensive knowledge of our industry. As a result, they may be able to respond more quickly to new or emerging technologies and changes in customer requirements. We may not be able to compete successfully against our current and/or future competitors. If we are unable to compete successfully against our competitors, our business will be seriously harmed.

The Company faces competition from various companies within the industry. While the Company believes that its business model, development strategies and management experience will provide a competitive advantage, the Company can give no assurance that larger, better financed competitors will not underprice the Company's product or services.

## *Failure to Manage Growth*

We anticipate significant expansion of our operations in an effort to achieve our product development, marketing and integration objectives. We may encounter significant strain and additional demands on our management systems, infrastructure and resources. Our ability to compete effectively and to manage future expansion will require us to continue

- 17 -

to add to our infrastructure and management controls and expand, train and manage our workforce. If we are unable to manage our expansion, our level of service will decline, we may lose customers and our revenues and growth will be limited.

### Lack of Barriers To Entry

The Company's business is largely based on relationships and contracts that could be replicated by competitors. While certain processes and data used to develop and administer the program are proprietary, other parties may develop similar programs to compete with the Company's networks.

### Uncertainty of Hiring and Retaining Skilled Personnel

Qualified personnel are in great demand throughout the industry. While we do not believe that our success depends on numbers of highly skilled employees, we do depend on our ability to attract, train and retain skilled personnel. Our failure to attract and retain our highly trained personnel will materially adversely affect the business.

### Reliance Upon Principals

The Company is substantially dependent on the service of the Managing Member. The loss of their services would have a material adverse impact on the business of the Company. The success of the Company depends to a large degree upon the efforts of management. The Managing Member shall have the exclusive control of all aspects of the business of the Company and in this regard will make all decisions relating to operations such as the selection of personnel and the amount of proceeds to apply to other purposes. The Managing Member believes that its accumulated knowledge of the business will allow the Company to successfully pursue sound management and financial strategies to continue as an ongoing concern. No person should purchase any of the securities offered hereby unless he or she is willing to entrust all aspects of the Company's operations to the Managing Member and its principals.

### Consequence of Liquidation

There can be no guarantee this venture can be operated profitability or to the extent anticipated. If the Company's operations are unsuccessful or unprofitable and liquidation of the Company results, it is highly unlikely that the investor(s) would be able to recoup any of their initial investment. Proceeds allocated to and expended on operating activities, such as marketing, office expenses, travel, salaries, taxes, insurance, consulting fees, legal expenses and other professional fees will not be recoverable. The Company will have extremely limited tangible assets available for liquidation.

### Forward Looking Statements

When used in the Disclosure Document, the words "believes," "anticipates," "expects," and similar expressions are intended to identify forward-looking statements within the

meaning of Section 27A of the Securities Act. The outcomes expressed in such statements are subject to a number of risks and uncertainties that could cause actual results to differ materially from those projected, including the risks described in this "Risk Factors" section. Given these uncertainties, prospective investors are cautioned not to place undue reliance on these statements. The Company also undertakes no obligation to update these forward-looking statements.

### Litigation

The Company is not presently a party to any material litigation, nor to the knowledge of Management is any litigation threatened against the Company, which may materially affect the business of the Company or its assets.

### Risks of Exit Strategy

The future value of an investment in the Units is highly dependent on the Company being funded and the success of this venture. There is no assurance that any of these events will occur, or if they occur, the time required for such events to occur which may impact the exit strategy of the Company. Moreover, the Company may not be able to consummate any of the exit strategies as stated in this Memorandum.

### Lack of Operating History

The Company was formed on March 16, 2006. The Company has no operating history that investors can use to evaluate the past performance of the Company. It is a development stage company and subject to all risks and uncertainties inherent in the creation of a new business and the development of new products and services. Further, the Company may incur substantial operating losses, and our continued existence is dependent upon our ability to generate profitable operations and to secure necessary financing to fund our future operations. The likelihood of our future success must be considered in light of the absence of an operating history and the possibility of operating losses, as well as the problems, expenses, difficulties, risks and complications frequently encountered in connection with similarly situated companies. There can be no assurance that the Company will ever generate revenues or that our operations will ever be profitable. As a result, this investment involves risk. A purchaser must be able to bear the risk of a significant loss of the investment.

### Regulatory Risk

This Offering has not been registered under the Securities Act in reliance on the exemptive provisions of section 4(2) of the Securities Act and Regulation D promulgated thereunder. Similar reliance has been placed on apparently available exemptions from securities qualifications requirements under applicable state securities laws. No assurance can be given that the Offering currently qualifies or will continue to qualify under one or more of such exemptive provisions due to, among other things, the adequacy of disclosure and the manner of distribution, or the retroactive change of any

securities law or regulation. If, and to the extent that, claims or suits for rescission are brought and successfully concluded for failure to register this Offering or for acts or omissions constituting offenses under the Securities Exchange Act of 1934, as amended, or applicable state securities laws, the Company could be materially and adversely affected, jeopardizing its ability to operate successfully. Furthermore, the human and capital resources of the Company could be adversely affected by the need to defend actions under these laws, even if the Company is ultimately successful in its defense.

### Dependence on Proceeds of Offering

The Company's business plan is largely dependent upon receipt of proceeds from the sale of the Units included in this Offering and in subsequent offerings. Consequently, the probability that the Company will successfully achieve the goals set forth in its business plan is reduced if the Company is unable to sell a certain amount of securities in a subsequent offering. Investors who purchase Units in this Offering will assume a risk that the Company may be unable to sell securities in a subsequent offering and its opportunities for success will be reduced accordingly.

### Future Capital Needs and Uncertainty of Additional Financing

The implementation of our business strategy will require significant expenditures of capital, and if revenues are not generated as anticipated or if development costs exceed available funds, we may be required to raise additional financing. There can be no assurance that commitments for such financings will be obtained on favorable terms, if at all. Equity financing could result in dilution to holders of Membership Units, and debt financing could result in the imposition of significant financial and operational restrictions. Lack of access to adequate capital on acceptable terms could have a material adverse effect on our business, results of operations and financial condition, especially in the event of future delays in widespread market acceptance of our products.

### Control by Managing Member; No Voting Rights for Membership Units

The Company is manager controlled rather than member controlled. Following this Offering, the Managing Member will maintain sole and exclusive control over the Company's management. The Company's LLC Agreement provides that the general management of the Company vests in the Managing Member. Additionally, the LLC Agreement sets forth the person to be appointed as the Managing Member. The holders of Membership Units are not entitled to vote on any matters affecting the Company, except as required by applicable law or as set forth in the LLC Agreement.

### Liquidity Risks Associated with this Offering

*There is No Public Market for the Securities.* There is no public trading market for our Membership Units, and it is not anticipated that such a public trading market will develop in the foreseeable future. If no public trading market develops, it may be difficult or impossible for you to resell your Membership Units if you should desire to do so. The

Company cannot assure you that you will be able to resell your Membership Units at the purchase price paid in this Offering or at any price.

*The Membership Units Have Limited Marketability, Transferability and Lack Liquidity.* There is no market through which the Company's Membership Units may be sold and even if there were such a market, transfer of the Membership Units are subject to significant restrictions described in this Memorandum and in our LLC Agreement. The Membership Units have not been registered under the Securities Act in reliance on the exemptions provided by Sections 3(b) and 4(2) thereof and Regulation D promulgated thereunder, and by analogous exemptions under state securities laws. The Membership Units may not be sold, transferred or otherwise disposed of at any time absent either registration under the Securities Act and applicable state securities laws or pursuant to an exemption from registration and, if requested by us, an opinion of counsel satisfactory to us and our counsel that registration is not required under those laws for such sale, transfer or other disposition and that any such sale transfer or other disposition will not be in violation of the Securities Act or applicable state securities laws or any rule or regulation promulgated thereunder. Investors should be aware that they will be required to bear the financial risk of this investment for an indefinite period of time. In addition, the Membership Units will likely not be readily acceptable as collateral for loans. Therefore, prospective investors who require liquidity in their investments should not invest in the Membership Units.

*The Value of the Membership Units After This Offering May Be Lower Than the Price Paid*

The purchase price for the Units was not established in a competitive market. Rather, the purchase price was determined arbitrarily by the Company. The price of the Units in this Offering bears no relationship to the Company's assets, book value, historical results of operations or other established criteria of value, and may not be indicative of the fair value of the Membership Units. The price of the Membership Units that will prevail in any market that may develop sometime in the future following this Offering may be higher or lower than the price you pay.

*Discretion in Using the Net Proceeds*

Although we have identified generally in this Memorandum how we expect to use the net proceeds from this Offering, the Managing Member will have broad discretion in determining the specific uses of the net proceeds. You will not have the opportunity to evaluate the economic, financial or other information on which we base our decisions on how to use the net proceeds. However, the net proceeds from this Offering will be used for general corporate purposes as described herein.

*Uncertainty of Distributions*

The Company has not made any distributions to the holders of its Membership Units. Our prospects for future earnings, if any, are dependent on, among other things, the

successful implementation of our business strategy following the completion of the Offering. There is no assurance that the Company will generate adequate profits in the future to make distributions to its holders of Membership Units.

### *Dilution*

If you purchase Membership Units in this Offering, you will experience immediate and substantial book value dilution, in that the price you pay will be substantially greater than the net tangible book value per Membership Unit you acquire. You will experience additional book value dilution if the Company issues additional Membership Units following this Offering.

### *Federal Income Tax Risks*

As the Company will likely be treated as a partnership for federal income tax purposes, each Member must include in his/her own income his/her allocable share of the Company's taxable income, whether or not any cash is distributed and, as a result of various limitations imposed by the tax laws regarding passive losses and otherwise, may be unable to currently deduct his/her allocable share of Company expenses and capital losses, if any. Because the Managing Member will not make regular cash distributions to the Members, a Member may be subject to taxes on income allocated to them but which they have not received. See "Tax Aspects."

### USE OF PROCEEDS

The Company shall use the proceeds of this Offering for general corporate purposes, including without limitation, the purchase of an existing restaurant property. The Company believes it will achieve success by purchasing an existing restaurant venue and developing the property into a new and exciting food, drink and gathering place targeted to a mixture of young urban professionals who are looking for an entertainment establishment that compliments their lifestyle. The Company intends to purchase an established restaurant near the busy intersection of Ontario and Franklin in Chicago, Illinois. Once the sale is closed the Company intends to immediately begin demolition and remodel the property into a sleek new, customer friendly eating and drinking establishment. A contract has been signed on the property and the Company intends to close on or before June 1, 2006. This new establishment is anticipated to re-open during the third quarter 2006. The Managing Member believes it has the knowledge, contacts and reputation necessary to recognize and capitalize on existing and developing opportunities.

The foregoing represents the Company's best estimate of the use of the net proceeds of the Offering based upon the current state of its business, its current plans and current economic and industry conditions. These estimates are subject to change based upon such factors as the amount and timing of the revenues from sales of its products and services, the cost of producing such revenues and the volume and rate of administrative expenditures. See "Risk Factors – Discretion in Using the Net Proceeds."

The net proceeds to the Company from this Offering, estimated to be $1,700,00.00 if the maximum of 17 UNITS are sold or $1,050,000.00 if the minimum of 10.5 UNITS are sold, less payment for offering expenses shall be used for working capital purposes. However, the foregoing represents the Company's best estimate of the allocation of the proceeds of this offering based upon the Company's current plans and current economic conditions, and is subject to reallocation in the Company's discretion. The expenses incurred in developing and pursuing our business plans cannot be predicted with any degree of certainty.

The company believes that proceeds from the Maximum Offering Amount and cash flow generated from operations will be sufficient to fund the operation. Such belief, however, cannot give rise to an assumption that cost estimates are accurate or that unforeseen events will not occur that will require additional funding to meet needs for working capital. In addition, there can be no assurance that financing arrangements and cash flow generated from operations will be sufficient to implement the business objectives. As a result, substantial additional financing may be required to implement current business objectives. There can be no assurances that the Company will be able to obtain additional funding when needed, or that such funding, if available, will be obtainable on terms acceptable to it.

In the event that operations do not generate sufficient cash flow, or the Company cannot obtain additional funds if and when needed, it may be forced to curtail or cease activities, which would likely result in loss to investors of all or a substantial portion of their investment.

## MANAGEMENT

*Principals of the Managing Member and Managing Group:*

### ANTHONY A. DEMASI, ESQ.

### MANAGING MEMBER, TSUNAMI CAPITAL, LLC.

Mr. Demasi is currently the managing member of Tsunami Capital, LLC. Tsunami Capital is a dynamic capital management and law firm focusing on hedge fund and private placement regulation. Tsunami offers creative and effective financial solutions for not-for-profit organizations, tax regulation, tax arbitrage and risk analysis, and venture capital management. Mr. Demasi has dedicated a considerable amount of time starting up Tsunami's first entertainment venue *Reserve*. Utilizing cutting edge marketing techniques, legal skills, hospitality insight, and networking abilities, Mr. Demasi has help create an exciting and profitable entertainment experience.

Mr. Demasi recently served as an Associate Attorney at the Law Firm of Henderson & Lyman. Since 1996, Mr. Demasi has been developing his understanding of legal structures and analysis of securities and tax law and their interface with the Capital Markets.

Mr. Demasi specializes in the practice areas of Securities and Commodity Futures law including representing Investment Advisers, Investment Companies, Venture Capital Firms, entrepreneurs and transactional work involving securities issuance, corporate formation, non-profit formation and compliance as well as corporate tax planning. He has represented domestic and international hedge funds, charitable organizations, investment advisory firms, broker-dealers, start-up companies, as well as individual traders. Mr. Demasi has conducted administrative work on over twenty hedge funds.

Mr. Demasi worked at Gardner Carton & Douglas Law Firm in the Investment Management Group in Chicago. His primary duties were to form and administer international and domestic hedge funds, charitable organizations, and to represent Investment Advisers.

His regulatory experience includes tenure at the United States Securities and Exchange Commission in the Division of Enforcement and The National Association of Securities Dealers, Office of Dispute Resolution in Washington, DC. During this period, Mr. Demasi worked primarily with quantitative legal analysis and reviewed many financials for Mutual Funds and Hedge Funds.

Anthony Demasi was employed as an Associate of the Risk Management and the Financial Analytics & Structured Transactions ("FAST") groups at Bear Stearns & Co, Inc. in New York. During that time, Mr. Demasi performed risk analysis of high yield bonds, asset-backed securities, and emerging market debt. In the FAST group, Anthony performed regulatory analysis and its impact on client's portfolios and fixed-income traders' positions. He also worked with the legal department, presenting fixed-income trading data to attorneys for a Grand Jury Subpoena and the AR Barons Settlement Hearing in front of the New York Attorney General, Department of Justice, Federal Bureau of Investigation, and the Securities and Exchange Commission.

Mr. Demasi received a L.LM degree "with distinction" from Georgetown Law Center and a Juris Doctor degree from the Columbus School of Law, Catholic University. He also holds a Bachelor of Arts "with honor" in International Relations, with a minor in Economics, and a B.A. in Philosophy from the James Madison College at Michigan State University.

Mr. Demasi is a published member of the Georgetown Law Review, "*Regulation of Swaps Derivatives*, Bank One v. IRS." He has appeared on CNN's television show *Burden of Proof.* Anthony has current membership status in the Illinois State Bar Association, the Washington, D.C. Bar Association, the American Bar Association, and is a licensed arbitrator for the National Association of Securities Dealers. His civic involvement includes membership in The Sons of Italy, and is the founder of the Tsunami Foundation, a 501(c)(3) dedicated to career development and educational mentoring of high-school students.

- 24 -

## EOIN CALLERY

### PARTNER, RESERVE

Eoin Callery is currently a partner in Reserve, the first entertainment property of Tsunami, and is the driving force behind the distinctive and upbeat music selection that has made the club well known. Mr. Callery also serves as a member of Tsunami Capital, LLC where he is a part of the management team.

Music is the true passion of Mr. Callery, and he is able to bring that interest to life on dance floor of Reserve each night. He has originated an eclectic music venue for the club which spans all areas of the musical spectrum from old school hip hop to never before heard European beats. It is through his contacts overseas that he is able to keep the crowd excited with these rare imported tracks. Mr. Callery is also responsible for the unique blend of rock and hip hop in a collaboration referred to as "mashing" which involves layering different artists and/or genres of music together to create a new sound, a concept in which Reserve has pioneered.

Mr. Callery was raised in Dublin where he studied Engineering at Trinity University. It was in 1997 when he relocated to Chicago that he realized his affinity for the financial market and managed to secure an interview with a local trading firm. For the past nine years he has worked as a principle for Wolverine where he specializes in and manages a division in index options arbitrage.

## NICHOLAS DEMASI

### CHIEF OF OPERATIONS

Mr. Demasi is currently the General Manager of Reserve, the first entertainment property of Tsunami. Mr. Demasi is responsible for the management of the entire staff, relationships with vendors, ordering of all inventory, table reservations, client relations, and the day to day operations of the entire venue.

Mr. Demasi was previously overseeing the Front Office at the Vail Cascade Resort & Spa, a Destination Resorts Property. Mr. Demasi is a member of the Executive Committee and has managed all departments in the rooms division. Under his supervision Conde Nast has rated Vail Cascade as one of the Top Ten Resorts in the world and has rated the Property AAA Four-Diamond each year. Meeting planners have consistently rated this property their number one choice and the Resort has carried forward a reputation for excellence that was established with numerous awards during Mr. Demasi's tenure. Prior to his work for Destination Resorts; Mr. Demasi's professional experience culminated with years working in all aspects of the hospitality industry including fine dinning restaurants, casinos, conference hotels and resorts. This

diverse collection of experience has fostered excellence, professionalism, and passion in each area of the hospitality industry.

Mr. Demasi began his formal management training at Caesars Lake Tahoe where he reported to the Director of Operations and contributed to the management and operations in fifteen different departments. Mr. Demasi was in charge of forecasting and compiling special projects to ascertain more efficient methods to allocate resources through the department heads. Mr. Demasi's "on the floor" time was spent in the beverage department where he managed the eight casino bars. In this capacity, Mr. Demasi cultivated his management skills and became an effective leader. Mr. Demasi credits the many hospitality executives who have acted as mentors in developing his skills as well as his combination of training and studying.

Mr. Demasi also has been a liaison for a successful fine dinning restaurant in Washington, DC. While working in Washington, DC, his duties involved cultivating relationships with architects, zoning officials, investors, promotional representatives, management and employees to make sure everything was integrated from start to finish. Mr. Demasi trained the employees on the new system and positioning as well as purchasing the products in the absence of the General Managers.

Mr. Demasi received his Bachelor of Arts from "The School of Hospitality Business" at Michigan State University in the Eli Broad College of Business. Mr. Demasi serves on the Executive Committee for the Vail Valley Community Organization that endeavors to connect organizations with the community.


## BRIAN K. HARTWELL

## VICE PRESIDENT, TSUNAMI CAPITAL, LLC.

Brian Hartwell is currently the vice president of Tsunami Capital, LLC. Tsunami Capital is a dynamic capital management and law firm focusing on hedge fund and private placement regulation. Tsunami offers creative and effective financial solutions for nonprofit organizations, tax regulation, tax arbitrage and risk analysis, and venture capital management.

Mr. Hartwell is a board member of the Tsunami Foundation (http://www.tsunamifoundation.org). The Foundation is a 501(c)(3) charitable organization whose mission is to foster innovation and to promote education of high school and college level students by providing resources pertaining to all aspects of career development; including financial support, educational programs and networking opportunities.

Prior to joining Tsunami Capital, Hartwell served as law clerk to the Honorable Judge Robert H. Hodges, Jr., in the United States Court of Federal Claims in Washington, D.C.

The Court of Federal Claims possesses jurisdiction to entertain any suit for money against the United States which does not sound in tort and which is founded upon the Constitution, an act of Congress, an Executive Order, a regulation of an Executive Department, or any express or implied-in-fact contract with the United States. Hartwell was primarily responsible for researching the substantive and procedural aspects of the law, and assisting the Judge in drafting Orders and Opinions. As a law clerk, Hartwell was exposed to cases involving government contracts, tax refunds, government employee and veterans benefits, land use, Indian lands, and patent and copyright. Hartwell graduated with a B.A. in Communications from North Carolina State University and received his J.D. from Michigan State University – Detroit College of Law in 2001.

## MATTHEW J. MERING

### CHIEF OPERATING OFFICER, TSUNAMI CAPITAL, LLC.

Mr. Mering is currently the Chief Operating Officer of Tsunami Capital LLC. Prior to Tsunami, Matthew spent several years working in the hospitality industry. His initial exposure to the industry occurred in 1995 where he spent the summer working at a bar/restaurant in a resort area located in Northern Michigan. Upon completion of his undergraduate studies, Mr. Mering accepted a position as a food and beverage manager with Club Med. In his two years at Club Med, Matthew was responsible for managing a nightclub, two bars and a restaurant at Club Med's Cancun, Mexico resort. Matthew has also worked at several hospitality venues in the Chicago area. These experiences have enabled him to further his understanding of the nightclub industry and develop a deeper understanding of the factors that drive the entertainment marketplace in Chicago.

Mr. Mering also spent three years in the management consulting industry working with Accenture L.L.C. During his tenure at Accenture, Matthew helped several financial services clients develop their corporate strategies. After working out of Accenture's Chicago office for two years, Matthew transferred to Accenture's Melbourne, Australia office where he spent another two years consulting Fortune 500 clients in the Australasia region. During his stint in Melbourne, Matthew started a promotional venture with local nightlife entrepreneurs as well as bartended at a local nightclub/lounge during his free time.

Matthew received his Bachelor of Arts in International Relations from the James Madison College at Michigan State University. He is currently pursuing his M.B.A. from the University of Chicago where he is focusing on Finance and Strategy.

## RYAN J. PREUETT

### DIRECTOR OF MARKETING, RESERVE

Mr. Preuett currently serves as the Director of Marketing for Reserve, Tsunami's first entertainment property. Mr. Preuett is responsible for overseeing and implementing all marketing initiatives. He is also responsible for determining advertising placements that will most cost effectively reach the desired target market for various nights and events. Another big part of his everyday role is to manage the internal public relation efforts. He works closely with Wagstaff Worldwide on a daily basis, one the nation's leading hospitality PR firms, to maximize their contacts and leverage all possible media angles. Mr. Preuett manages all promotional materials and the Reserve website.

Mr. Preuett serves as the President of the Junior Board for the Tsunami Foundation (http://www.tsunamifoundation.org).

Prior to working for Reserve, Mr. Preuett performed a wide variety of tasks at Tsunami Capital LLC and the Tsunami Foundation. While his focus was with the special events for the Tsunami Foundation, he also helped with several different projects on the Tsunami Capital side. He played an integral part in putting together both Strides & Tides fundraisers. Each year over 1000 people attended and Ryan was directly in charge of the marketing and promotion. Securing sponsorship was another area in which he demonstrated great success. Lastly, he put together and managed the raffle for both events, which profited over thirty thousand dollars each year.

Mr. Preuett's experience in the hospitality industry began at Rockit Ranch Productions when he moved to Chicago in September of 2002. His primary role there was the promotion and marketing of Le Passage. His responsibilities were expanded to also include the marketing of Rockit's special events as well. Through his stay with Rockit Ranch he gained valuable insight in marketing, promotion, PR, advertising, and client management.

Mr. Preuett graduated from the University of Michigan in May of 2002 with a BA in Economics.

### LEGAL MATTERS

Anthony A. Demasi, Esq., is serving as counsel to the Managing Member and the Company in connection with this Offering. Anthony A. Demasi, Esq., may serve as counsel to the Company and/or the Managing Member with respect to matters arising after the completion of the Offering and the sale of the Units and may in the future serve as counsel to the Managing Member. Anthony A. Demasi, Esq. disclaims any duty to any Members or prospective Investor Members in connection with the Offering of Member Interests or any other matter described in this Memorandum.

The Law Firm of Samuel V.P. Banks is serving as counsel to the Company in connection with Liquor licensing and other city licensing matters, including zoning. Samuel V.P. Banks disclaims any duty to any Members or prospective Investor Members in connection with the Offering of Member Interests or any other matter described in this Memorandum.

## TAX ASPECTS

The following is a summary of certain aspects of the federal income taxation of the Company and its Members that prospective investors should consider. A complete discussion of the federal, state, local and foreign income tax consequences of investing in the Company is beyond the scope of this summary. Before investing, prospective investors must consult their own tax advisors regarding the federal, state, local and foreign income tax consequences of an investment in the Company in light of their particular situations. The Managing Member does not make any representations regarding the tax consequences of the Company's operations. The following general discussion assumes that each member is an individual who is a United States citizen or resident that is not tax-exempt and that each Member holds its Interest as a capital asset and is the initial holder of such Interest. The following discussion does not deal with the consequences of ownership of a Unit in the Company by special classes of holders such as banks, thrifts, insurance companies, dealers, traders in securities that elect to mark their securities portfolios to market and other investors that do not own their Interests as capital assets. The following summary is based on the Internal Revenue Code of 1996, as amended (the "Code"), regulations enacted under the Code ("Regulations"), court decisions and published IRS rulings that are in effect on the date of this Memorandum. Future legislative or administrative changes or court decisions may significantly change the conclusions expressed below, and these changes or decisions may have a retroactive effect.

### *Partnership Status*

The Company has been advised by counsel that, provided that the Company does not elect to be taxed as a corporation for federal income tax purposes and continues to be organized and operated in accordance with the provisions of the LLC Agreement and applicable state law, the Company will be taxable as a partnership for federal income tax purposes and not as an association taxable as a corporation or "publicly-traded company," and, therefore, as an entity will not be subject to any federal income tax. This advice is based upon certain representations made to counsel by the Managing Member that the Company will comply with applicable rules to prevent treatment of the Company as a publicly-traded company. No ruling from the IRS with respect to partnership status has been or will be sought. Advice of counsel has no binding effect on the IRS, and, in the absence of a ruling, there can be no assurance that the IRS will not successfully contend that the Company should be treated as an association taxable as a corporation.

If the Company should at any time be classified as an association taxable as a corporation, the Members would not be treated as partners for tax purposes, income or

loss of the Company would not be passed through to the members and the Company would be subject to tax on its income at the rates applicable to corporations. In addition, all or a portion of distributions made by the Company to the Members could be taxable to them as dividends (to the extent of current or accumulated earnings and profits) or capital gains, while none of those distributions would be deductible by the Company in computing its taxable income. Any such recharacterization would reduce the after-tax return to a member from its investment in the Company.

The discussion in the following paragraphs assumes the Company will be treated as a partnership for federal income tax purposes.

## Taxation of Income or Losses of the Company

Since, as discussed above, the Company will be classified as a partnership for federal income tax purposes, no federal income tax will be payable by it as an entity. Instead, each Member will be required to take into account such Member's distributive share of the items of income, gain, loss, deduction and credit of the Company. The Company will file an annual partnership information return that will report the results of its operations. Each Member otherwise required to file a federal income tax return will be required to report separately, on its own federal income tax return, its allocable share (whether or not distributed) of the Company's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or loss, and various other categories of income, gain, loss, deduction or credit for the fiscal year of the Company ending within or with the Member's taxable year.

Since the Members will be required to include Company income in their respective income tax returns without regard to whether there have been distributions from the Company attributable to that income, the Members may be liable for federal and state income taxes on that income even though they have received no cash or other property from the Company. While the LLC Agreement may allow the Members to withdraw amounts from their Capital Accounts, actual withdrawals may not in fact be sufficient to pay all federal, state and local taxes arising out of a Member's investment in the Company.

It is possible that the Company might have a net loss for federal income tax purposes during a taxable period. Certain Members (generally, all Members subject to tax which are not widely held corporations) may be subject to limitations on the deduction of their shares of Company losses and deductions, including the passive loss rules, at-risk rules, and potential capital loss limitations. See "Passive Loss Limitations," "At-Risk Rules," and "Capital Loss Limitation," below. The deductions of any Member will not be deductible to the extent in excess of that Member's basis in its interest in the Company. Allocated deductions that are not allowed may be carried over indefinitely and claimed as a deduction in a subsequent year to the extent such Member's basis in its interest in the Company has increased above zero. See "Basis of Company Interest and Distributions," below.

## *Allocations of Income and Loss*

A partner's distributive share of partnership income, gain, loss, deduction or credit for federal income tax purposes is usually determined in accordance with the allocation provisions of a partnership agreement. However, under Section 704(b) of the Code, an allocation will be respected only if it either has "substantial economic effect" or is in accordance with the partner's "interest in the partnership." If an allocation contained in the LLC Agreement does not meet either test, the IRS will make the allocation in accordance with its determination of the Member's interest in the Company.

The Regulations under Section 704(b) of the Code are extremely complex and in many respects subject to varying interpretations. Moreover, because the regulations were promulgated relatively recently, there has been little relevant administrative or judicial interpretation of them. The allocations contained in the LLC Agreement may not comply in all respects with the regulations' requirements for having substantial economic effect or for being deemed to be in accordance with the Members' interests in the Company. However, although the matter is not free from doubt, the Managing Member believes that the allocations to the Members contained in the LLC Agreement are in accordance with the Members' interests in the Company and will be sustained in all material respects. It should be noted, however, that there can be no assurance that the IRS will not claim that these allocations are not in accordance with the Members' interests in the Company and, therefore, attempt to change the allocations to the Members. In such an event, some Members' distributive shares of the Company's taxable income may increase, while others' may decrease.

## *Differences Between Book Income and Tax Income*

Profits and losses allocated to the Members will include their respective shares of unrealized gain or loss. However, such items may not be taken into account for federal income tax purposes until realized or, in some cases, even later. If the relative interests of the Members change in the interim (e.g., because of the admission of a new Member or a withdrawal of a Member), the gain or loss recognized for tax purposes on the disposition of an asset will be allocated, to the extent possible, to reflect the prior allocation of the unrealized gain or loss, which will not necessarily be in the same nature as the interests of the Members at the time of disposition. For these and similar reasons, it is possible for a Member to be allocated taxable income even though the Company (or that Member) suffers an economic loss, or be allocated tax losses at a time that the Company (or that Member) enjoys substantial economic profits. Usually, such discrepancies even out over a period of time, but, because of certain technical rules under subchapter K of the Code, it may be impossible to do so in all cases. The Managing Member will make such corrective allocations as, consistent with the tax law and after consulting with the Company's tax advisors, may in its judgment be most appropriate to eliminate or minimize these differences between book and tax income.

- 31 -

### Basis of Company Interest and Distributions

A Member's tax basis in its Interest will include the amount of money that the Member contributes to the Company, increased principally by (i) any additional contributions made by the Member to the Company, (ii) the Member's distributive share of any Company income, and (iii) the amount, if any, of the Member's share of the Company's nonrecourse indebtedness; and decreased, but not below zero, principally by (x) distributions from the Company to the Member, (y) the amount of the Member's distributive share of the Company's losses, and (z) any reduction in the Member's share of the Company's nonrecourse indebtedness. In the case of non-liquidating distributions other than cash (and other than certain ordinary income type assets, like accounts receivable) the basis is reduced (but not below zero) by the basis of the property distributed.

Special rules apply in determining the basis of an interest in a partnership which has been transferred in a taxable transaction or by reason of death. Each prospective investor should consult with its own tax advisor with regard to such transfers.

Generally, a cash distribution to a Member will be taxable only to the extent it exceeds the Member's basis in its Interest. The amount of that excess generally would be taxable as capital gain. Distributions of property other than cash (or certain ordinary income type assets) are generally not taxable although any unrealized gain with respect to such property may be taxable upon the subsequent disposition of such property.

### Sale of an Interest or Withdrawal

A Member generally will recognize capital gain or loss on the sale of an Interest in the Company. The amount of gain or loss recognized will be determined by the difference between the amount realized and the Member's adjusted tax basis in its Interest. See "Basis of Company Interest and Distributions," above. For this purpose, the amount realized includes the Member's share of outstanding Company nonrecourse liabilities, if any.

### Elections as to Basis Adjustments

The LLC Agreement does not require the Managing Member to make an election as to basis adjustments under Section 754 of the Code, nor does it prohibit the Managing Member from doing so. In general, a Section 754 election, if made, would permit the Company to adjust the tax basis of its assets to reflect a transferee Member's basis in an Interest in the Company sold or exchanged, or transferred upon the death of a Member. Certain adjustments might also arise if assets are distributed in kind. These elections are usually beneficial if the Company's properties have appreciated in value. However, if there are many transfers or distributions to which the election applies, the calculation of the adjustments and the necessary record keeping become extremely complicated and costly. Consequently, the Managing Member, in its discretion, may choose not to make the election.

Other elections may be available as well in accordance with applicable rules. The Managing Member may exercise its discretion in making such elections.

## Passive Loss Limitations

The Code substantially restricts the ability of many taxpayers to deduct losses derived from so-called "passive activities." Passive activities generally include any activity involving the conduct of a trade or business in which the taxpayer does not materially participate, including the activity of a limited liability company in which the taxpayer is a member, and certain rental activities, including the rental of real estate. It is likely that a Member's interest in the Company will be treated as a passive activity. Accordingly, the Company's income and loss, other than interest income that will constitute portfolio income, will generally constitute passive activity income and passive activity loss, as the case may be, to the Members.

Losses from passive activities are generally deductible only to the extent of a taxpayer's income or gains from passive activities and will not be allowed as an offset against other income, including salary or other compensation for personal services, active business income or "portfolio income," which includes nonbusiness income derived from dividends, interest, royalties, annuities and gains from the sale of property held for investment. Passive activity losses that are not allowed in any taxable year are suspended and carried forward indefinitely and allowed in subsequent years as an offset against passive activity income in future years.

Upon a taxable disposition of a taxpayer's entire interest in a passive activity to an unrelated party (or a sale by a limited liability company to an unrelated party of all the assets used in a passive activity, as the case may be) suspended losses with respect to that passive activity will then be allowed as a deduction against:

- first, income or gain from that passive activity, including gain recognized on such disposition;

- second, income or gain for the taxable year from other passive activities; and

- thereafter, non-passive income or gain.

Regulations provide that similar undertakings that are under common control and owned by pass-through entities such as partnerships are generally aggregated into a single activity. Accordingly, it is unlikely that suspended passive activity losses derived from a specific Company property would be available to Members to offset non-passive income from other sources until the sale or other disposition of the last of the Company's properties, or the Member's taxable disposition of its entire interest in the Company.

- 33 -

## At-Risk Rules

The deductibility of partnership losses is limited further by the 'at risk' limitations set forth in the Code. Members who are individuals, estates, trusts and certain closely held corporations are not allowed to deduct partnership losses in excess of the amounts that such Members are determined to have 'at risk' at the close of the Company's fiscal year. Generally, a Member's 'amount at risk' will include the amount of its cash capital contribution to the Company, plus the Member's share of the Company's 'qualified nonrecourse financing.' A Member's 'amount at risk' will be reduced by his allocable share of Company losses and distributions and increased by his allocable share of Company income. Any deductions that are disallowed under this limitation may be carried forward indefinitely and utilized in subsequent years to the extent that a Member's 'amount at risk' is increased in those years.

## Capital Loss Limitation

A Member's loss, if any, upon the sale of an Interest in the Company or the disposition of property held by the Company generally will be considered a capital loss, and will be long-term if the Member has held its Interest in the Company (or the Company has held the property disposed of, as the case may be) for more than one year. Capital losses are generally deductible to the extent of capital gains; in addition, up to $3,000 of capital losses ($1,500 for married individuals filing separately) recognized by non-corporate Members may be deducted against ordinary income.

## Company Tax Returns; Audit

The Company tax returns are subject to review by the IRS and other taxing authorities, which may dispute the Company's tax positions. There can be no assurance that these authorities will not adjust the tax figures reported in the Company returns. Any recharacterizations or adjustments resulting from an audit may require each Member to pay additional income taxes and interest and possibly result in an audit of other items on the Member's own return, and any audit of a Member's return could result in adjustments of non-Company, as well as Company, income and deductions. Any adjustment would give rise to interest and could give rise to penalties.

Generally, upon an IRS audit, the tax treatment of Company items will be determined at the Company level pursuant to administrative or judicial proceedings conducted at the Company level. Each Member generally will be required to file its tax returns in a manner consistent with the information returns filed by the Company or be subject to possible penalties, unless the Member files a statement with its return on IRS Form 8082 describing any inconsistency. Pursuant to the LLC Agreement, the Managing Member shall be the "tax matters partner" of the Company. The Managing Member will be able to extend the statute of limitations on behalf of all Members with respect to Company items. A Member may file with the IRS a statement that the Managing Member does not have the authority to enter into a settlement agreement on behalf of that Member.

- 34 -

## State and Local Taxes

Each Member may be liable for state and local income taxes payable in the state or locality in which it is a resident or doing business or in a state or locality in which the Company conducts or is deemed to conduct business. In addition, the Company may own properties in states and localities that impose taxes on the Company's assets or income. The income tax laws of each state and locality may differ from the above discussion of federal income tax laws so each prospective Member should consult its own tax counsel with respect to potential state and local income taxes payable as a result of an investment in the Company.

THE FOREGOING IS A BRIEF SUMMARY OF CERTAIN MATERIAL INCOME TAX MATTERS THAT ARE PERTINENT TO PROSPECTIVE INVESTORS. THE SUMMARY IS NOT, AND IS NOT INTENDED TO BE, A COMPLETE ANALYSIS OF ALL PROVISIONS OF THE FEDERAL INCOME TAX LAW WHICH MAY HAVE AN EFFECT ON SUCH INVESTMENTS. THIS ANALYSIS IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. ACCORDINGLY, PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR OWN RESPECTIVE TAX ADVISORS WITH RESPECT TO THEIR OWN RESPECTIVE TAX SITUATIONS AND THE EFFECTS OF THIS INVESTMENT THEREON.

## MISCELLANEOUS

### Controlling Law

This Memorandum and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed, interpreted and enforced in accordance with the laws of the State of Illinois without regard to conflict of law provisions.

### Copying the Private Placement Memorandum

No party may photocopy, facsimile, or otherwise transfer or transmit their original or any copy of this Memorandum to any other party without the express written consent of the Company. A general exemption to this rule is that a party may provide a copy of this document to his, her, or its legal, tax, accounting and/or financial advisors for the sole purpose of obtaining legal, tax, accounting and/or financial advice from these parties. Such a copy, if provided to these agents of the investor, shall not be construed as being an offering to any of these agents, but rather is provided as information only so that the agent(s) may render appropriate professional advice to such person(s) about his contemplated investment herein. This Offering is made only to the party directly receiving this Memorandum from the Company for the purpose of offering the Units described herein.

From time to time, the Company may need to provide to, among other parties, its counsel, accountants, government agency, banking and brokerage firms a copy of this Memorandum. Such a copy may be required by such parties for legal, compliance or other reasons which are necessary to the performance of their duties to the Company. Such copy shall not be construed as an offering to any of this parties and shall be utilized by those parties only for the purposes of facilitating the professional relationships contemplated between the Company and such party.

## Titles Not to Affect Interpretation

The titles of sections and subsection contained in this Memorandum are for convenience only and they neither form a part of this Memorandum nor are they to be used in the construction or interpretations hereof.

## ADDITIONAL INFORMATION

This Memorandum does not purport to restate all of the relevant provisions of the documents referred to or pertinent to the matters discussed herein, all of which must be read for a complete description of the terms relating to an investment in the Company.

The Company shall make available to an investor such additional information reasonably necessary in verifying the accuracy of the information contained herein as shall be reasonably available to the Company. Each prospective investor is encouraged to ask questions and seek more information regarding the terms and conditions of this Offering hereof. Such questions should be directed to the Company at the address and telephone number set forth below.

**Tsunami Entertainment LLC**
455 N Cityfront Plaza Drive, #1420
Chicago, Illinois 60611
Telephone: (312) 836-0001
Facsimile: (312) 836-1118

ONLY INFORMATION OR REPRESENTATIONS CONTAINED HEREIN MAY BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY TO GIVE ANY SUCH INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFERING BEING MADE HEREBY AND IF GIVEN OR MADE, SUCH INFORMATION MUST BE RELIED UPON AS HAVING BEEN INFORMATION NOT EXPRESSLY SET FORTH IN THIS MEMORANDUM. THE INFORMATION PRESENTED AS OF THE DATE ON THE HEREOF, UNLESS ANOTHER DATE IS SPECIFIED, AND NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE HEREUNDER SHALL CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION PRESENTED SUBSEQUENT TO SUCH DATE(S).

*How to Subscribe*

Prospective, suitable investors intending to subscribe to purchase Units offered hereby should complete, sign and deliver (1) the attached Subscription Agreement, and (2) the counterpart signature page to the Limited Liability Company Agreement. In addition, the investor should transmit to the Escrow Agent a check made payable to New Century Bank, Escrow Agent—Tsunami Entertainment LLC or a wire transfer of funds for the total dollar value (USD United States Dollars) of the number of Units purchased at the following address: New Century Bank, 363 W. Ontario Street, Chicago, IL 60610. Subscribers wishing to arrange for a wire transfer should contact the Managing Member at (312) 836-0001 for further instructions. Fully completed and duly executed documents (other than the check) should be delivered or sent to:

**Tsunami Entertainment LLC**
455 N Cityfront Plaza Drive, #1420
Chicago, Illinois 60611

By its terms, execution of the Subscription Agreement constitutes a binding offer to subscribe to and purchase Units of the Company and may not be withdrawn without permission from the Company. The payment by each prospective investor will be placed, together with the payments of the other prospective investors, in a non-interest bearing, segregated escrow account, until the subscription of such investor is accepted by the Company. We will review the Subscription Agreement and determine whether to accept the subscriptions proposed thereby. If a subscription is accepted, we will so notify the prospective investor and the purchase price will remain deposited with the Escrow Agent until the closing for the subscribed Units. If the subscription is not accepted, we will so notify the prospective investor and will arrange for the return of the prospective investor's funds, without interest, as soon as practicable.

If the Minimum Offering Amount has not been sold by September 15, 2006, the Escrow Agent will return to each prospective investor the full amount of his or her cash payment, without interest or deduction, within ninety (90) calendar days; provided, however, that the Company may extend this period by an additional ninety (90) calendar days in which to raise the Minimum Offering Amount. In the event that the Minimum Offering Amount is not raised during the extended period, the Escrow Agent will return to each prospective investor, the full amount of his or her cash payment, without interest or deduction, within thirty (30) calendar days.

We may, in our sole discretion, reduce each prospective investor's requested amount of Units by any amount without any prior notice to or consent by any prospective investor. In this event, each prospective investor's funds in excess of the purchase price for the Units issued to the investor will be returned as soon as practicable following the closing date.

- 37 -

The Company may in its sole discretion, waive strict compliance with the foregoing procedures with respect to any Subscription. However, a waiver of any requirement set forth herein or in the Subscription Agreement by the Company shall not be deemed as a waiver of any other requirement therein. The Company may, in its sole discretion, reject any Subscription in whole or in part.

The Company may hold more than one closing with respect to the Units offered hereby. The initial closing will not be held with respect to less than (10.5) Units. There will be no minimum aggregate amount of Units required to be sold at any subsequent closing. The initial closing and any subsequent closings will be held at times and places and on dates selected by us. We may elect to extend the Offering period for an additional period.

## Closing Conditions

Each prospective investor will not be deemed to have purchased any of the Units until such time as all of the following conditions to closing have occurred: (i) the prospective investor executes and delivers the Subscription Agreement in form and substance satisfactory to us and our counsel; (ii) the purchase price for the Units has been delivered to the Escrow Agent; (iii) the Minimum Offering Amount is subscribed and Subscription Agreements satisfactory to us and our counsel have been executed and delivered; and (iv) any appropriate conditions of closing, as determined by us and our counsel have occurred. In addition, it shall be a condition to the obligations of the subscribers, in the Offering to purchase the subscribed for Units at the Closing and that no law, rule or regulation shall have been enacted or proposed which would impair our ability to conduct our business as contemplated in this Memorandum.



TSUNAMI CAPITAL, L.L.C.

# MEMORANDUM

To:         Investor
From:       Anthony Demasi, Brian K. Hartwell
Date:       May 10, 2006
Re:         222 West Ontario Street

Projected Raise is equal to Two million two hundred ($2,200,000) Dollars.

Purchase price = One million fifty thousand ($1,050,000) dollars
Build out /renovation = Five hundred fifty thousand ($550,000) dollars
Operating capital = One hundred thousand ($100,000) dollars

The payback schedule(s) is as follows and shall be paid out of NET PROFITS after all expenses and allowing for sufficient operating capital, i.e., ($100,000):

Returns on investment ("ROI") shall be based on the Class of Unit(s).

(a) First, TO BE PAID QUARTERLY. Class B member(s) shall receive the first twenty (20%) percent of net profits. Thereafter, Class A member(s) shall receive the remaining eighty (80%) percent of net profits until such member(s) has received an aggregate amount equal to one hundred (100%) percent of its initial capital contribution.

(b) Thereafter, TO BE PAID BI-ANNUALLY. Class B member(s) shall receive the first twenty (20%) percent of net profits. Thereafter, the remaining Eighty (80%) of net profits shall be split Fifty (50%) percent to Class A member(s) and Thirty (30%) percent to Class B member(s).

Tsunami Capital LLC and Investor mutually agree to the following:

(c) In the event management can establish an agreement with Adam Goldstein (AKA DJ AM) (the "Artist") to provide residency DJ services, Class B member(s) and Class A member(s) mutually agree to offer Artist a to be determined equity interest. This Interest shall be split equally between Class B member(s) and Class A member(s). *This provision shall be negotiated and is subject to unanimous approval from all Members.*

(d) In the event management can establish an agreement with Phil Stefani to provide services for the Company, Class B member(s) and Class A member(s)



EXHIBIT

3

mutually agree to offer Mr. Stefani a to be determined equity interest. This Interest shall be split equally between Class B member(s) and Class A member(s). ***This provision shall be negotiated and is subject to unanimous approval from all Members.***

Expenses for the club are to include:
1) All normal operating costs
2) GM salary (aprox 70,000)
3) Chef salary (aprox. 60,000)
4) Marketing/Party planner salary (aprox. 55,000)

Roles and Responsibilities of respective groups:

Investor:
    1) Secure financing or fund project
    2) Trouble shooting when necessary

Tsunami Capital LLC:
    1) Marketing and public relations campaigns prior to opening (create buzz)
    2) Control political reactions and be a liaison between business and community
    3) Create concept and design
    4) Staff
    5) Train all employees
    6) Create and conceptualize menu
    7) Market all opening parties
    8) Create music theme
    9) Run day to day operations
    10) Run day to day marketing efforts
    11) Solicit and plan parties and special events
    12) Cross market and sell sponsorships
    13) Control PR
    14) Book keep and manage all costs and perform financial analytics
    15) Control inventory
    16) Have overall business strategy session meeting at a minimum once weekly
    17) Utilize new and existing contacts to create National brand

Very truly yours,

**READ, APPROVED AND ACCEPTED:**

By: _____    By: _____
    Anthony A. Demasi        Investor
    Tsunami Capital LLC
    455 N. Cityfront Plaza Drive
    Suite 1420
    Chicago, IL 60611

Date: _____    Date: _____

# FILED

APR 2 5 2007 NF

APR 25, 2007

MICHAEL W. DOBBINS

CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

U.S. Commodity Futures Trading
Commission,

Plaintiff,

v.

Anthony A. Demasi and Tsunami Capital,
LLC,

Defendants.

)
)
)
)
)
)
)
)
)
)

07CV2256
JUDGE GETTLEMAN
MAGISTRATE JUDGE COLE

---

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT

### I.  SUMMARY

1.  From at least December 2004 to the present ("the relevant time"), Anthony Demasi ("Demasi"), individually and as the controlling person of Tsunami Capital, LLC ("Tsunami Capital"), solicited and accepted at least $300,000 from at least three individuals who invested in early 2005 for the purpose of trading financial futures.

2.  Demasi represented to prospective and actual pool participants that Tsunami Capital operated a commodity pool, structured as Tsunami Lakeshore Integrated Fund ("Tsunami Lakeshore"), which traded financial futures on behalf of pool participants.

3.  Demasi convinced at least one prospective pool participant to invest by providing him with a false track record showing that Tsunami Lakeshore was profitable in all but two months during 2003 and 2004 and had its highest monthly return of 26.85% in April 2003. In reality, Tsunami Lakeshore did not have an active account in April 2003, lost money every month that it traded in 2003, and did not trade at all in 2004.

EXHIBIT
4

4. Demasi and Tsunami Capital also distributed false statements to at least two pool participants throughout 2005 showing that they were earning substantial profits when the trading accounts in the names of Tsunami Capital and Tsunami Lakeshore were overall unprofitable.

5. By making deceptive and misleading statements to pool participants and prospective pool participants regarding profit potential and risk of loss, Defendants cheated, defrauded and deceived pool participants and prospective pool participants, in violation of Sections 4b(a)(2)(i) and (iii), and 4o(1) of the Commodity Exchange Act, as amended ("Act," 7 U.S.C. §§ 6b(a)(2)(i) and (iii), and 6o(1) (2000).

6. Defendants also cheated, defrauded or deceived, or attempted to cheat, defraud or deceive other persons by knowingly issuing false statements and a false track record to at least one pool participant, in violation of Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii).

7. Demasi's violations of Sections 4b(a)(2)(i), (ii) and (iii), and 4o(1) of the Act were done within the scope of Demasi's employment with Tsunami Capital and, therefore, Tsunami Capital is liable for those violations, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2000).

8. Demasi was a controlling person of Tsunami Capital. As such, Demasi is liable for Tsunami Capital's violations of Sections 4b(a)(2) and 4o(1), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2000).

9. Accordingly, the Commodity Futures Trading Commission ("CFTC") brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2000), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act. In addition, the CFTC seeks restitution, disgorgement, civil monetary penalties and such other equitable relief as this Court may deem necessary or appropriate.

2

## II.   JURISDICTION AND VENUE

10.   This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2000), which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action in the proper District Court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

11.   Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2000), because the Defendants reside in this District and the acts and practices in violation of the Order have occurred within this District.

12.   Unless restrained and enjoined by this Court, Defendants are likely to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

## III.   THE PARTIES

13.   Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 et seq. (2000), and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2006).

14.   Defendant **Tsunami Capital, LLC,** is an Illinois limited liability company, established in 2002. Its principal place of business is 455 North Cityfront Plaza Drive, #3110, Chicago. Tsunami Capital was registered with the Commission as a commodity pool operator ("CPO") and commodity trading advisor ("CTA") from April 2003 to July 2005, when it

3

withdrew its registration. Tsunami Capital is not currently registered with the CFTC in any capacity. Demasi is the principal and managing member of the company.

15.     Defendant **Anthony A. Demasi** is the principal and managing member of Tsunami Capital. He currently resides in Chicago, IL and is a licensed attorney. Demasi was listed as a principal of Tsunami Capital from May 2003 to July 2005. Demasi is not currently registered with the CFTC in any capacity.

## IV.    FACTUAL BACKGROUND

### A. Statutory Background

16.     Section 1a(5) of the Act, 7 U.S.C. § 1a(5) (2000), defines a CPO as any person engaged in the business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

### B. Tsunami Capital's and Tsunami Lakeshore's Trading Accounts

17.     From October 2002 to September 2006, Defendants opened and maintained six commodity futures accounts at Man Financial Inc. ("Man"), a registered futures commission merchant ("FCM"), four in the name of Tsunami Capital and two in the name of Tsunami Lakeshore.

18.     Defendants funded only four of the six accounts at Man; three Tsunami Capital accounts and one Tsunami Lakeshore account. These funded accounts traded financial futures, such as the S&P 500, NASDAQ 100, Dow Jones Industrials, NYSE composite, as well as US Treasury Bonds, and Eurodollars.

4

19.    A total of $291,425 was pooled and deposited into the one funded Tsunami Lakeshore account. The account was opened in June 2003 and by December 2003 all the funds were lost trading. The account closed in January 2005.

20.    A total of $1,939,000 was deposited into the three funded Tsunami Capital accounts between October 2002 and September 2006. By September 2006, $1,318,459 had been withdrawn and $620,542 had been lost trading.

21.    The Tsunami Capital and Tsunami Lakeshore accounts collectively lost money in 22 of the 29 months they were active.

### C.  Solicitation Fraud

#### 1.    Tsunami Capital and Demasi Provided Pool Participants and Prospective Pool Participants With False Statements and a False Track Record.

22.    Demasi solicited Brett Simons ("Simons") to invest in Tsunami Lakeshore in December 2004.

23.    At that time, Demasi told Simons that Tsunami Capital operated Tsunami Lakeshore, and that Tsunami Lakeshore was a commodity pool trading commodity futures with six million dollars invested, with a minimum investment of $50,000.

24.    Contrary to Demasi's representations, however, in December 2004 Tsunami Lakeshore had a deficit of $4,425 in its trading accounts and none of the Tsunami Capital accounts were open or active.

25.    In January 2005, Demasi provided Simons with a document titled "Confidential Private Placement Memorandum Tsunami Lakeshore Integrated Fund, LLC," stating that Tsunami Lakeshore's managing member and commodity pool operator is Tsunami Capital and that Demasi is the principal of Tsunami Capital. It also stated that the pool would use Man and Refco, Inc. for clearing its trades.

5

26.     In an attempt to get Simons to invest, Demasi also gave Simons a profit and loss spreadsheet on Tsunami Capital letterhead. The spreadsheet falsely claimed that Tsunami Lakeshore's trading was profitable in all but two months in 2003 and 2004, with rates of return as high as 26.85% in April 2003 and 22.21% in May 2003.

27.     Defendants had one other active trading account in 2003, but it was carried at Man in the name Tsunami Capital. It was opened in October 2002, lost money trading every month except for February 2003, and closed in June 2003 with a total loss of $229,834.

28.     As a result of the false profits represented in the profit and loss spreadsheet Demasi gave to Simons, in January 2005 Simons invested $50,000 with Tsunami Capital for the purpose of trading in the Tsunami Lakeshore commodity pool.

29.     Simons invested an additional $100,000 in March 2005 as a result of Demasi's verbal representations that his previous $50,000 investment was profitable.

30.     Simons received his first quarterly statement in April 2005 on Tsunami Capital letterhead showing that he had profited 17%, when in fact, the Tsunami Lakeshore account was inactive and had carried a debit balance of -$4,425 since January 2004 and had been closed in January 2005 and the Tsunami Capital accounts had only profited 3% during that quarter.

31.     The quarterly statements that Simons received from Demasi for calendar year 2005 and the first quarter of 2006 all reflected that Simons' investments were earning profits. However, the Tsunami Lakeshore trading account was closed in January 2005, and the Tsunami Capital trading accounts, if even part of the pool, sustained losses or were less profitable than represented in five of the six quarterly statements Simons received.

32.     Demasi told Simons that 30 to 35 pool participants had invested with Tsunami Capital for the purpose of trading in the Tsunami Lakeshore pool.

6

33.    At least two others, did, in fact, invest in Tsunami Lakeshore. Jay Deutsch ("Deutsch") invested $50,000 in April 2005 and Mike Budicak ("Budicak") invested $100,000 in early 2005, after Demasi had represented to them that Tsunami Lakeshore had been profitable.

34.    Deutsch's fourth quarter 2005 statement showed that he had profited 7.71%, but the actual return for the Tsunami Capital trading accounts that quarter was -46% and the Tsunami Lakeshore trading account had been closed in January 2005.

35.    Simons did not receive a statement for the quarter ending December 2005. When he asked Demasi and others at Tsunami Capital about the status of his investment, he was simply told "it's up" without any further explanation.

### 2.    Pool Participants Have Had Difficulty Withdrawing Their Funds

36.    At Deutch's request, on January 3, 2006, Simons requested that Demasi refund Deutsch's balance, $63,384. Although Demasi advised Simons that Deutsch's funds were forthcoming, they were not returned until February 2006.

37.    Also around this time, Simons requested that Demasi return $200,000 that Simons had invested in another Tsunami Capital and Demasi business venture, Sugartooth Entertainment, LLC ("Sugartooth"), for the purpose of opening a nightclub in Chicago.

38.    On information and belief, this $200,000 investment in Sugartooth was commingled with funds intended for investment in the Tsunami Lakeshore commodity pool.

39.    In response to Simons' request, Demasi tried to persuade Simons not to withdraw his funds from Sugartooth. When Simons continued to request that Demasi return his funds, Demasi falsely promised Simons that the funds were forthcoming, but failed to deliver them.

40.    In June 2006, Simons requested return of his principal and interest reported on his Tsunami Lakeshore statements, which then totaled $294,515. Demasi tried to persuade Simons

7

not to withdraw his funds. When Simons continued to request the return of his funds, Demasi stalled, giving various excuses why he could not yet return Simon's funds.

41.     In August 2006, Simons hired an attorney who sent Tsunami Capital and Sugartooth demand letters requesting return of his principal and interest as reported on his last statement in June 2006 for the Tsunami Lakeshore fund totaling $294,515, and his $200,000 investment in Sugartooth.

42.     In response to the demand letters, in September 2006, Demasi sent Simons two checks for $100,000. Both checks bounced.

43.     Finally, Demasi repaid Simons the entire amount plus an additional $1,485 in interest on the Sugartooth investment in various installments in late September, October, and November 2006.

44.     Budicak requested return of his balance in December 2006, and was told it would be returned in January 2007. On information and belief, to date, Budicak has not received his funds.

**D. Demasi is a Controlling Person of Tsunami Capital**

45.     At all relevant times, Demasi has been the sole principal and managing member of Tsunami Capital.

46.     Demasi exercised control over the day-to-day business operations of Tsunami Capital and Tsunami Lakeshore.

47.     On information and belief, Demasi hired and supervised Tsunami Capital's employees.

8

48.    Demasi solicited prospective pool participants, and is the signatory on Tsunami Capital and Tsunami Lakeshore's account agreements with Man, and the Tsunami Lakeshore and Tsunami Capital bank accounts at New Century Bank.

49.    Demasi knowingly induced Tsunami Capital's violations by personally participating in the fraud by knowingly misrepresenting profit potential, risk of loss, and trading profits to prospective and actual pool participants.

50.    Demasi also knowingly distributed a false track record to at least one pool participant and false statements to at least two others, and failed to return pool participants' funds when requested, including issuing bad checks to at least one pool participant.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

### VIOLATIONS OF SECTIONS 4b(a)(2)(i) AND (iii) OF THE ACT: FRAUD BY MISREPRESENTATION

51.    The allegations set forth in paragraphs 1 through 50 are re-alleged and incorporated by reference.

52.    Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), make it unlawful for any person to cheat or defraud or attempt to cheat or defraud; or willfully deceive or attempt to deceive by any means whatsoever other persons in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

9

53.      Beginning in at least December 2004 and continuing through the present, Demasi and Tsunami Capital willfully violated Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), among other things, by: (1) soliciting investments through fraudulent misrepresentations about Tsunami Lakeshore's past performance results; (2) misrepresenting to at least one pool participant that Tsunami Lakeshore was averaging 40% to 50% annual returns when it was either losing money or not trading; and (3) creating and delivering Tsunami Lakeshore's statements that falsely reported the pool's trading performance and the pool participant's investment value.

54.      The actions and omissions of Demasi, as described in this Count One, were done within the scope of his employment with Tsunami Capital and, therefore, Tsunami Capital is liable for his violations of Sections 4b(a)(2)(i) and (iii) of the Act, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2.

55.      During the relevant time, Demasi directly and indirectly controlled Tsunami Capital and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count I. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Demasi is liable for the violations described in this Count I to the same extent as Tsunami Capital.

56.      Each material misrepresentation or omission from at least December 2004 to the present, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i) and (iii) of the Act.

10

## COUNT TWO

### VIOLATIONS OF SECTION 4b(a)(2)(ii) OF THE ACT: FRAUD BY MAKING FALSE STATEMENTS

57.     The allegations set forth in paragraphs 1 through 50 are re-alleged and incorporated herein.

58.     Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii), makes it unlawful for any person to willfully make or cause to be made to other persons false reports or statements, or willfully to enter or cause to be entered for other persons false records in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

59.     Demasi and Tsunami Capital willfully violated Section 4b(a)(2)(ii) of the Act by, among other things, making or causing to be made false reports and false statements issued or communicated to at least one pool participant who invested money with Demasi and Tsunami Capital in the Tsunami Lakeshore pool to trade commodity futures contracts.

60.     The actions and omissions of Demasi, as described in this Count II, were done within the scope of his employment with Tsunami Capital and, therefore, Tsunami Capital is liable for his violations of Sections 4b(a)(2)(ii) of the Act, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2.

61.     During the relevant time, Demasi directly and indirectly controlled Tsunami Capital and its employees, and did not act in good faith or knowingly induced, directly or

indirectly, the acts constituting the violations described in this Count II. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Demasi is liable for the violations described in this Count II to the same extent as Tsunami Capital.

62. Each false report or statement made during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(ii) of the Act.

### COUNT THREE

### VIOLATIONS OF SECTION 4o(l) OF THE ACT: FRAUD BY COMMODITY POOL OPERATORS

63. The allegations set forth in paragraphs 1 through 50 are re-alleged and incorporated herein.

64. Sections 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B), prohibit any CPO and any AP of a CPO from directly or indirectly employing any device, scheme or artifice to defraud any client, participant or prospective client or participant, or engaging in transactions, practices or a course of business which operate as a fraud or deceit upon any client or participant or prospective client or participant by using the mails or other means or instrumentalities of interstate commerce.

65. Beginning in or about December 2004 and continuing through the present, Demasi, while acting as an AP of a CPO, and Tsunami Capital, while acting as a CPO, violated Section 4o(1) of the Act, 7 U.S.C. § 6o(1), in that they have employed or are employing, schemes or artifices to defraud pool participants or prospective pool participants or have engaged or are engaging in transactions, practices or a course of business which operate and operated as a fraud or deceit upon pool participants or prospective pool participants by using the mails or other means or instrumentalities of interstate commerce. The fraudulent acts included, but are not

12

limited to the following: (1) soliciting investments through fraudulent misrepresentations about Tsunami Lakeshore's past performance results; (2) misrepresenting to at least one pool participant that Tsunami Lakeshore was averaging 40% to 50% annual returns when it was either losing money or not trading; and (3) creating and delivering Tsunami Lakeshore's statements that falsely reported the pool's trading performance and the pool participant's investment value.

66.     The actions and omissions of Demasi, as described in this Count III, were done within the scope of his employment with Tsunami Capital and, therefore, Tsunami Capital is liable for his violations of Sections 4o(1) of the Act, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2.

67.     During the relevant time, Demasi directly and indirectly controlled Tsunami Capital and its employees, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count III. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Demasi is liable for the violations described in this Count III to the same extent as Tsunami Capital.

68.     Each material misrepresentation or omission made during the relevant time period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4o(1) of the Act.

## VI.     **RELIEF REQUESTED**

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2000), and pursuant to its own equitable powers, enter:

A.     An order finding that Defendants violated Sections 4b(a)(2)(i), (ii), and (iii), and 4o(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (ii) and (iii), and 6o(1) (2000);

13

B.      Enter an *ex parte* statutory restraining order and an order of preliminary injunction pursuant to Section 6c(a) of the Act restraining Defendants and all persons or entities insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendants who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.      Destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants wherever located;

2.      Refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of the Defendants wherever located, including all such records concerning Defendant's business operations;

C.      Enter an *ex parte* statutory restraining order and an order of preliminary injunction pursuant to Section 6c(a) of the Act restraining Defendants, and all persons insofar as they are acting in the capacity of their agents, servants, successors, employees, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendants, who receive actual notice of such order by personal service or otherwise, from directly or indirectly, withdrawing, transferring, removing, dissipating, concealing, or disposing of, in any manner, any funds, or other property, wherever situated, including, but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes, and all funds

14

on deposit in any financial institution, bank, or savings and loan account held by, under the control of, or in the name of Defendants.

    D.    Enter orders of preliminary and permanent injunction enjoining Defendants and all persons insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with them who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

        1.    Engaging in conduct in violation of Sections 4b(a)(2)(i), (ii) and (iii), and 4o(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (ii) and (iii), and 6o(1) (2000);

        2.    Engaging in, controlling, or directing the trading of any commodity futures or options accounts, on Defendants' own behalf or for or on behalf of any other person or entity, whether by power of attorney or otherwise.

    E.    Enter an order directing that Defendants make an accounting to the Court of all of Defendants' assets and liabilities, together with all funds Defendants received from and paid to pool participants and other persons in connection with commodity futures and options transactions or purported commodity futures and options transactions, including the names, mailing addresses, email addresses and telephone numbers of any such persons from whom they received such funds from April 3, 2003 to the date of such accounting, and all disbursements for any purpose whatsoever of funds received from pool participants, including salaries, commissions, fees, loans and other disbursements of money and property of any kind, from April 3, 2003 to and including the date of such accounting;

    F.    Enter an order requiring Defendants immediately to identify and provide an accounting for all assets and property that they currently maintain outside the United States,

15

including, but not limited to, all funds on deposit in any financial institution, futures commission merchant, bank, or savings and loan accounts held by, under the control of, or in the name of Demasi, Tsunami Lakeshore and/or Tsunami Capital, whether jointly or otherwise, and requiring them to repatriate all funds held in such accounts by paying them to the Clerk of the Court, or as otherwise ordered by the Court, for further disposition in this case.

G.     Enter an order requiring Defendants to disgorge to any officer appointed or directed by the Court or directly to pool participants all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act as described herein, including pre-judgment interest;

H.     Enter an order requiring Defendants to make restitution by making whole each and every pool participant or other person whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

I.     Enter an order requiring Defendants to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of: (1) triple the monetary gain to Defendants for each violation of the Act, Regulations, and Order, or (2) a penalty of $120,000 for each violation committed prior to October 23, 2004 or $130,000 for each violation committed on or after October 23, 2004;

J.     Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (1994); and

16

K.    Enter an Order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

Dated:  April 25, 2007                    Respectfully Submitted,

Susan J. Gradman (Illinois ARDC No. 6225060)
Lead Trial Attorney
sgradman@cftc.gov

Scott R. Williamson (Illinois ARDC No. 06191293)
Deputy Regional Counsel
swilliamson@cftc.gov

Rosemary Hollinger (Illinois ARDC No. 3123647)
Regional Counsel and Associate Director
rhollinger@cftc.gov

COMMODITY FUTURES TRADING COMMISSION
525 W. Monroe St., Suite 1100
Chicago, IL  60661
(312) 596-0523 (Gradman direct dial)
(312) 596-0520 (Hollinger direct dial)
(312) 596-0560 (Williamson direct dial)
(312) 596-0714 (facsimile)

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| U.S. Commodity Futures Trading Commission, | ) No. 07 CIV _____ |
| Plaintiff, | ) |
| v. | ) **07C 2256** |
| Anthony A. Demasi and Tsunami Capital, LLC, | ) 07 C 2256 |
| Defendants. | ) JUDGE GETTLEMAN |
|  | ) MAGISTRATE JUDGE COLE |

## [Proposed] *EX PARTE* STATUTORY RESTRAINING ORDER

Having read the Complaint for Injunctive and Other Equitable Relief, the Plaintiff's

Motion for an *Ex Parte* Statutory Restraining Order, the Declaration of William Heitner and

exhibits thereto, and the transcript of testimony of Brett Simons, and the brief submitted in

support of its motion;

**THE COURT FINDS:**

1. The Court has jurisdiction over the subject matter.

2. Section 6c of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 13a-

1 (2000), permits this Court to enter a statutory restraining order ("SRO").

3. It appears that there is good cause to believe that Defendants Antony A. Demasi

and Tsunami Capital, LLC, have engaged, are engaging in and are about to engage in violations

of Sections 4b(a)(2)(i), (ii) and (iii) and 4o(1) of the Commodity Exchange Act, as amended

("Act") 7 U.S.C. § 6b(a)(2)(i), (ii) and (iii) and 6o(1) (2000). There is good cause to believe that

immediate and irreparable damage to the Court's ability to grant effective final relief for pool

participants in the form of monetary redress will occur from the sale, transfer, assignment, or

**EXHIBIT**

5

other disposition by the Defendants of their assets or destruction of records unless the Defendants are immediately restrained and enjoined by Order of this Court and, accordingly, there is good cause to issue this order

   3.  It further appears to the satisfaction of the Court that this is a proper case for granting an *ex parte* statutory restraining order to preserve the status quo and to protect public investors from further loss and damage.

**ORDER**

**DEFINITIONS**

For the purposes of this Order, the following definitions apply:

   6.  "Assets" means any legal or equitable interest in, right to, or claim to, any real or personal property, including but not limited to chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts including bank accounts and accounts at financial institutions, credits, receivables, lines of credit, contracts including spot and futures contracts, insurance policies, and all cash, wherever located.

   7.  The term "document" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(a), and includes, writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations from which information can be obtained and translated, if necessary, through detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

   8.  "Defendants" means, Anthony A. Demasi and Tsunami Capital, LLC and any person insofar as he or she is acting in the capacity of an officer, agent, servant, employee or

2

attorney of Defendants, and any person who receives actual notice of this Order by personal service or otherwise, including Federal Express and facsimile, insofar as he or she is acting in concert or participation with Defendants.

## RELIEF GRANTED

## STATUTORY RESTRAINING ORDER

### *I. ASSET FREEZE*

**IT IS ORDERED** that Defendants are restrained and enjoined from directly or indirectly withdrawing, transferring, removing, dissipating, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, converting, or otherwise disposing of any funds, assets or other property, wherever located, including funds, property or assets held outside the United States, except as ordered by the Court. The assets affected by this Paragraph shall include both existing assets and assets acquired after the effective date of this Order, as well as accounts not specifically identified below.

**IT IS FURTHER ORDERED** that, pending further Order of this Court, any financial or brokerage institution, business entity, or person that holds, controls, or maintains custody of any funds, assets or other property of the Defendants, or has held, controlled, or maintained custody of any funds, assets or other property of the Defendants, and who receives notice of this order by any means, including facsimile, electronic mail, and Federal Express, shall:

A.    Prohibit Defendants and any other person from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling or otherwise disposing of any such assets except as directed by further order of the Court;

B.    Deny Defendants, and all other persons access to any safe deposit box that is:

    1.    titled in the name of the Defendants, either individually or jointly; or

3

2.      otherwise subject to access by the Defendants;

C.      Provide counsel for the CFTC within five (5) business days of receiving a copy of this Order, a statement setting forth:

1.      the identification number of each such account or asset titled in the name, individually or jointly, of the Defendants, or held on behalf of, or for the benefit, of the Defendants;

2.      the balance of each such account, or a description of the nature and value of such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and

3.      the identification of any safe deposit box that is either titled in the name, individually or jointly, of the Defendants, or is otherwise subject to access by the Defendants;

D.      Upon the request by the CFTC, promptly provide the CFTC with copies of all records or other documentation pertaining to such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; and

E.      Cooperate with all reasonable requests of the CFTC relating to implementation of this Order, including producing records related to Defendants' accounts and Defendants' businesses.

4

## II. *PROHIBITION OF DESTRUCTION OF BOOKS AND RECORDS*

**IT IS FURTHER ORDERED** that the Defendants and all persons or entities who receive notice of this Order by personal service or otherwise, including facsimile and Federal Express, are restrained and enjoined from directly or indirectly destroying, mutilating, erasing, altering, concealing or disposing of, in any manner, directly or indirectly, any documents that relate to the business practices or business or personal finances of the Defendants.

## III. *ACCESS TO AND INSPECTION OF BOOKS AND RECORDS*

**IT IS FURTHER ORDERED** that representatives of the CFTC be allowed immediately to inspect the books, records, and other documents of the Defendants and their agents including, but not limited to, electronically stored data, tape recordings, and computer discs, wherever they may be situated and whether they are in the possession of the Defendants or others, and to copy said documents, data and records, either on or off the premises where they may be situated.

## IV. *SERVICE OF ORDER AND ASSISTANCE OF U.S. MARSHALL'S SERVICE*

**IT IS FURTHER ORDERED** that copies of this Order may be served by any means, including facsimile transmission and Federal Express, upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of the Defendants, or that may be subject to any provision of this Order. William Heitner, Thomas Koprowski, Cynthia Cannon, and Venice Bickham, all employees of the CFTC, are hereby specially appointed to serve process, including this Order and all other papers in this cause.

**IT IS FURTHER ORDERED** that the United States Marshals Service is directed to assist the Commission with service of process, including the summons and complaint, and all other papers in this case as well as assist the Commission with taking control and custody of the assets, records and business premises of the Defendants.

5

## V. *SERVICE ON THE COMMISSION*

**IT IS FURTHER ORDERED** that the Defendants shall serve all pleadings,

correspondence, notices required by this Order, and other materials on the Commission by

delivering a copy to Susan Gradman, Senior Trial Attorney, Division of Enforcement,

Commodity Futures Trading Commission, 525 W. Monroe, Suite 1100, Chicago, Illinois 60661.

## VI. *COURT MAINTAINS JURISDICTION*

**IT IS FURTHER ORDERED** that this Statutory Restraining Order shall remain in full

force and effect until further Order of this Court, upon application, notice and an opportunity to

be heard, and that this Court retains jurisdiction of this matter for all purposes.

## VII. FURTHER COURT HEARINGS

4.    IT IS FURTHER ORDERED that this matter is set for a status hearing on _May 4 2007, at 8:45 a.m._

5.    IS FURTHER ORDERED that plaintiff's Motion for a Preliminary Injunction is set for presentation on _May 4, 2007, at 8:45 a.m._

**IT IS SO ORDERED.**

Signed at _8:50_ o'clock am/pm on the _26th_ day of _April_, 2007

_Calvin W. Gottlieb_

UNITED STATES DISTRICT JUDGE

6

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| U.S. Commodity Futures Trading Commission, | ) No. 07 C 2256 |
| | ) Judge Gettleman |
| | ) Magistrate Judge Cole |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Anthony A. Demasi and Tsunami Capital, LLC, | ) |
| | ) |
| Defendants. | ) |

## CONSENT ORDER MODIFYING ORDER FOR PRELIMINARY INJUNCTION AND OTHER ANCILLARY RELIEF AGAINST DEFENDANT ANTHONY A. DEMASI AND TSUNAMI CAPITAL, LLC

Plaintiff Commodity Futures Trading Commission ("Commission"), filed a Complaint for preliminary and permanent injunction and other relief, and moved for an *Ex Parte* Statutory Restraining Order pursuant to Section 6c of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. § 13a-1 (2000) on April 25, 2007. The Court entered the *Ex Parte* Statutory Restraining Order on April 26, 2007, and the Consent Order of Preliminary Injunction and Other Ancillary Relief Against Defendants Anthony A. Demasi and Tsunami Capital, LLC ("Preliminary Injunction") on May 4, 2007.

The parties have met and conferred regarding the asset freeze contained in paragraph 4 of the Preliminary Injunction, and have agreed that it should be modified as follows: the asset freeze on Lakeside Bank account in the name of Tsunami Entertainment, LLC ending in 4900 shall be dissolved and Defendant Demasi shall immediately transfer the balance, $46,445.17, to Lakeside Bank account in the name of Tsunami Capital, LLC # 2 ending in 1900, and these funds shall remain frozen. Defendant Demasi shall then be permitted to use the Lakeside Bank

1



EXHIBIT
6

account ending in 4900 for cash receipts and receipts from credit card charges from the Crescendo restaurant acquired after May 10, 2007 for the sole purpose of meeting payroll, operating, and related expenses for the Crescendo restaurant. Demasi will advise the Commission in writing, through its attorney Susan Gradman, of Crescendo restaurant's receipts and expenses paid on a monthly basis beginning May 31, 2007, and will also provide the Commission, through its attorney Susan Gradman, with receipts and expenses for the Reserve nightclub for the months of February, March and April 2007 by May 31, 2007.

WHEREFORE the parties agree that the Preliminary Injunction entered on May 4, 2007 shall be modified as described above.

IT IS SO ORDERED.

DATED: May 17, 2007 , 2007

The Honorable Robert W. Gettleman
United States District Court Judge

CONSENTED TO AND APPROVED BY:

Peter B. Shaeffer
Attorney for Defendants Anthony A. Demasi
and Tsunami Capital, LLC
30 N. LaSalle Street - Ste. 2140
Chicago, Illinois 60602
(312) 782-5306
(312) 201-4559 (facsimile)

Susan Gradman
Attorney for Plaintiff Commodity
Futures Trading Commission
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0523
(312) 596-0714 (facsimile)

Dated: May 16, 2007

Dated: May 16 , 2007

TIMOTHY J. RIORDAN: 1:07-cv-02992 Document #: 1 Filed: 05/24/07 Page 120 of 120 PageID #:120

**From:** TIMOTHY J. RIORDAN
**To:** PSHAEFFLAW@AOL.COM
**Date:** 5/17/2007 6:52:39 PM
**Subject:** Tsunami/Demasi

Mr. Shaeffer:

As we advised in our telephone conversation this afternoon, our firm represents a substantial number of the investors in Tsunami Entertainment LLC. They have come to us because it appears that over $4 million was raised based upon a prospectus which was to have raised only $2.2 million at most and no disclosure of the oversubscription was made to our clients.

We are aware that Mr. Demasi has refused our clients' earlier request that he withdraw from management and request that he reconsider. If he will not reconsider stepping down, our clients request that an independent accounting firm selected by our clients be retained to assess the quality and effectiveness of the internal financial controls at Crescendo and report weekly to this law firm the compliance by management with the controls.

Given that Crescendo is scheduled to open Friday night, we request a reply to this request early tomorrow.

Tim Riordan

Please confirm receipt.

Timothy J. Riordan
Defrees & Fiske
200 S. Michigan Ave. Suite 1100
Chicago, Illinois 60604
312-372-4000
312-939-5617(fax)
tjriorda@defrees.com
tjr3119@aol.com

This message and any files or text attached to it are intended only for the recipients named above, and contain information that is confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.

**EXHIBIT**

7